**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

JANE DOE,

                                        Plaintiff,                          8:23-cv-00426 (BKS/DJS)

v.

ST. LAWRENCE UNIVERSITY, and ERNESTO
MORALEZ, in his individual and professional capacity,

                                        Defendants.

---

ERNESTO MORALEZ,

                                        Counter-Claimant,

v.

JANE DOE,

                                        Counter-Defendant.

---

**Appearances:**

*For Plaintiff:*
Jeanne M. Christensen
Alfredo J. Pelicci
Wigdor LLP
85 Fifth Avenue
New York, NY 10003

*For Defendant St. Lawrence University:*
Jacqueline Phipps Polito
Erin M. Train
Littler Mendelson, P.C.
375 Woodcliff Drive, Suite 2D
Fairport, NY 14450

*For Defendant Ernesto Moralez:*
Andrew T. Miltenberg
Stuart Bernstein
Helen J. Setton
Nesenoff & Miltenberg, LLP
363 Seventh Avenue, Fifth Floor
New York, NY 10001

**Hon. Brenda K. Sannes, Chief United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.      INTRODUCTION

Plaintiff Jane Doe brings this employment discrimination action against Defendants St.

Lawrence University ("St. Lawrence," "SLU," or the "University") and Ernesto Moralez. (Dkt.

No. 1). Plaintiff asserts the following claims: gender discrimination and retaliation, in violation

of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, and Title IX of the Education

Amendments Act of 1972, 20 U.S.C. § 1681 et seq.; gender discrimination, hostile work

environment, retaliation, and aiding and abetting, in violation of the New York State Human

Rights Law; and negligence, negligent supervision, and negligent retention, sexual assault, and

sexual battery, in violation of New York state law. (*See generally id.*). Moralez filed an Answer

and Counterclaims against Plaintiff. (Dkt. No. 12). Moralez asserts claims under New York state

law for: defamation; intentional infliction of emotional distress; tortious interference with

contract; and civil conspiracy. (*See generally id.*). Presently before the Court are St. Lawrence

University's motion to dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(6),

(Dkt. No. 22), and Plaintiff's motion to dismiss the Counterclaims under Rule 12(b)(6), (Dkt.

No. 32). The motions are fully briefed. (Dkt. Nos. 33, 38, 40, 41). For the reasons that follow the

motions are granted in part and denied in part.

II.     **FACTS**[1]

 A. **Complaint**

  1. **The Parties**

St. Lawrence University is a not-for-profit private university located in Canton, New York. (Dkt. No. 1, ¶ 44). In fall 2019, Plaintiff, who has a bachelor's degree in sociology and a Ph.D., and has completed a postdoctoral fellowship, began teaching at the University and is, at present, a tenure track, assistant professor in the Sociology Department. (*Id.* ¶¶ 43, 75–76, 121). As Plaintiff lived in Vermont with her husband and children, she would travel to Canton, where she would stay in a bed and breakfast ("B&B") "on campus for her in person teaching days and other obligations." (*Id.* ¶ 79).

In July 2020, the University hired Moralez as the Co-Chair of the Public Health program[2] and an assistant professor. (*Id.* ¶ 82). Prior to teaching at the University, Moralez had served as an assistant professor at New Mexico State University ("NMSU"), where he had earned his undergraduate and master's degrees. (*Id.* ¶ 84). While Moralez was a graduate student at NMSU, "a female graduate student alleged sexual misconduct, based upon Moralez's alleged pressuring of her into sleeping in the same hotel room with him while they were away at an academic conference." (*Id.* ¶ 88). In 2005, while a student at NMSU, Moralez worked at Alma d'Arte Charter High School in New Mexico as an office assistant. (*Id.* ¶ 87). Moralez had "quit" his position at the high school "due to . . . 'uncomfortable situations,' after a high school student reported that he had physically touched and groped her." (*Id.* ¶ 87).

---

[1] These facts are drawn from the Complaint, (Dkt. No. 1), and Answer and Counterclaims, (Dkt. No. 12). The Court assumes the truth of, and draws reasonable inferences from, the well-pleaded factual allegations, *see Lynch v. City of New York*, 952 F.3d 67, 74–75 (2d Cir. 2020), but does not accept as true the legal conclusions, *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[2] Before the University hired Moralez it had received $15 million from an anonymous donor "to  develop the Public Health department." (Dkt. No. 1, ¶ 83).

### 2. The University's Knowledge of Sexual Harassment Allegations

#### a. General Knowledge

In 2014, students brought a "'NO MORE' campaign" to the University and "spoke out about the lack of attention to the rape culture at" the University. (Dkt. No. 1, ¶ 47). "At the time, a member of The Board of Trustees admitted that" the issue of sexual assaults at the University was "worse than it's ever been" and that a "specialist" had met with the Board "to help us understand steps to solving it." (*Id.* ¶ 47).

In 2015, North Country Public Radio ("NCPR") issued a report titled "Campus Rape in the North Country" that "detail[ed] how in the past SLU's administration has focused on SLU's reputation rather than the victims of assault." (*Id.* ¶ 51; *see also id.* ¶ 52 (alleging that according to "the in-depth piece by NCPR," "multiple people have been accused of assault and rape and they're all still here" and women at the University "tell me over and over that guys who sexually victimize people on campus rarely face serious consequences")).

In addition, in October 2021, "just months before" the alleged assault, "hundreds of students gathered in the yard of the University's President . . . to voice their outrage about SLU's failure to address the pervasive rape culture at SLU," and more than "700 people signed a petition to [the] President . . . calling out SLU's failures around preventing and investigating sexual assault at SLU." (*Id.* ¶ 49). "At some point, a 'task force' was appointed" to "support . . . victims after they suffer sexual violence." (*Id.* ¶ 50 & n.10).

#### b. Knowledge as to Moralez

The University hired Moralez in July 2020 without conducting "an in-depth background check" or "investigat[ing] any prior complaints of sexual assault that were made against him." (Dkt. No. 1, ¶¶ 54, 82). On May 8, 2021, the University was tagged in the following social media post: "Replying to @StLawrenceU in 2005 Ernesto Moralez sexually harassed me in high school

he later denied it when I reported him and got away with it." (*Id.* ¶ 89). The University was tagged in a similar post on May 10, 2021: "@stlawuAthComm in 2005 Ernesto Moralez sexually harassed me in high school he later denied it when I reported him and he got away with it. He was an adult and should not have gotten away with what he did. There's been other incidents." (*Id.*). In or around the same time, the Chancellor of NMSU, where Moralez had previously attended school and worked as a professor, was notified of the aforementioned allegations "through public social media posts." (*Id.* ¶¶ 84, 90). NMSU's Office of Institutional Equity documented this allegation in its "internal systems." (*Id.* ¶ 91).

On September 23, 2021, Ashlerose Francia, an equity officer and investigator at NMSU's Office of Institutional Equity, "reached out to Human Resources at St. Lawrence about the complaints made against Moralez."[3] (*Id.* ¶ 94, 99). On October 19, 2021, Francia "reached out again" to the University—"this time to" Assistant Vice President of Safety Gagnon, "to discuss Moralez." (*Id.* ¶ 100). Francia and Gagnon spoke on October 21, 2021, and Gagnon acknowledged that "the timing of the [2005] allegations coincided with Moralez's previous employment at . . . a public charter high school." (*Id.* ¶¶ 100, 103). "Gagnon never contacted [the high school] to ask questions or obtain more facts about the alleged complaints of sexual misconduct that were made against Moralez." (*Id.* ¶ 104). Plaintiff alleges that the University "opted to view Moralez as a present-day victim of online harassment and stop the line of inquiry there" "[b]ecause the person posting the online accounts refused to come forward and be questioned." (*Id.* ¶ 110).

---

[3] Francia and Moralez also spoke on September 23, 2021, "about the allegations of sexual misconduct," and Moralez claimed . . . that the allegations were 'false,'" that he "was a victim of online harassment and identity theft," and that he "had reported the situation to the police" in New York City and New Mexico. (*Id.* ¶ 98). "Moralez contacted the Canton, New York, police to report that he was the victim of alleged online stalking, after questions were being raised by" NMSU. (*Id.* ¶ 108).

At no point did St. Lawrence "seek more records from Moralez's previous employers or academic institutions, even after [Plaintiff] came forward in April 2022." (*Id.* ¶ 111).

### 3. Social Interaction Among University Faculty

Plaintiff alleges that the University encouraged faculty to "participate in the 'community' and interact with other faculty about work" and to not only "host[] events," but to host University-related events "at their homes." (Dkt. No. 1, ¶ 65). For example, on or about August 12, 2019, Plaintiff received an invitation "to a BBQ for the first-year faculty hosted by the second-year faculty." (*Id.* ¶ 68). The invitation exclaimed that "[t]his year Dr. Megan Carpenter (Psychology) has graciously offered to host the BBQ at her house!" (*Id.*). On September 1, 2020, shortly after Moralez was hired by the University, Plaintiff, then a "second-year faculty member" received the following message:

> From: Evelyn Jennings
> Sent: Tuesday, September 1, 2020 12:57:45 PM
> Subject: Connecting with new first year faculty
>
> Hello, Second Year Faculty! . . . . I write today to ask if you might be interested and willing to be a second year "buddy" for one of our new first year colleagues. I have listed their names and departments below . . . . My hope is more that you will be able to connect and welcome the new folks to the SLU community.

(*Id.* ¶ 67). Plaintiff responded that "she would be happy to be a 'buddy' to one of the 11 new faculty members." (*Id.*). The "buddy" request email was one of "countless" urgings by heads of departments and the administration to faculty "to engage in . . . social but 'work related' events." (*Id.* ¶ 68; *see also id.* ¶ 69 (January 11, 2023, invitation from "Academic Dean's Office" to "SLU Faculty Distribution Group" to a "First Year Mixer" hosted by the "First Year Program" ("FYP") asking: "Are you FYP clueless, FYP curious, or FYP committed? If you answered yes, please join us!")).

### 4.    Plaintiff's Teaching of Public Health Courses

Leah Rohlfsen,[4] who, as of 2021, served as Public Health Co-Chair with Moralez, (Dkt. No. 1, ¶ 127), told Plaintiff "that the University wanted Ms. Doe's courses to serve as prerequisites and required courses for the Public Health major and minor," (*id.* ¶ 135). "Rohlfsen also had told Ms. Doe that she would be tasked with creating a Community Based Learning ('CBL') experience, and that she would do this with Moralez."[5] (*Id.* ¶ 137). "The CBL would serve jointly to satisfy requirements in both Sociology and Public Health." (*Id.* ¶ 137). In addition, "[i]n multiple email exchanges, Rohlfsen had made clear to Ms. Doe that she expected [Plaintiff] to engage and work with Moralez." (*Id.* ¶ 157).

"[F]or a course from one department to be considered as satisfying a required course in another department, the Chair of the other department must evaluate and approve the course content." (*Id.* ¶ 133). At some point, Moralez "had . . . reviewed and approved Ms. Doe's pedagogy, as Ms. Doe's courses were being used to satisfy requirements in Public Health." (*Id.* ¶ 124). Of the twelve courses Plaintiff taught from fall 2020 through spring 2022, ten "satisfied requirements in the Public Health major and minor program." (*Id.* ¶ 136). Plaintiff also "had been working on potential CBL ideas to present to Moralez for the purpose of offering the experience to students in the Fall of 2023 and going forward." (*Id.* ¶ 138).

### 5.    Plaintiff's April 4, 2022, Third-Year Tenure Review

On April 4, 2022, Plaintiff, whose "tenure track was approximated at six years," (Dkt. No. 1, ¶ 143), "went through her third-year tenure review process," (*id.* ¶ 121). During this process, Cynthia Bansak "a professor who has held several administrative positions, encouraged

---

[4] Rohlfsen "was responsible for hiring" Plaintiff. (*Id.* ¶ 127).

[5] Plaintiff provides no timeframe for this alleged conversation.

7

[Plaintiff] to branch out more by collaborating with other professors, especially those outside of her department because, as is known, part of the tenure track review process is observing other professors teach and having your teaching be observed by other professors." (*Id.* ¶ 122). During the tenure review process, "comments were made that [Plaintiff] was not 'well-networked at [St. Lawrence]" and Plaintiff was "reminded that it is critical to tenure to co-teach courses, especially with professors in other departments, and to participate in activities with other professors and at the school." (*Id.*). "Bansak spoke to [Plaintiff] about these expectations" and the necessity of portraying "a highly collegial atmosphere." (*Id.* ¶ 123). The "written component" of Plaintiff's April 4, 2022 review stated that Plaintiff "should 'sit in classes of other faculty in her department and other departments . . . . [as] these class visits can spur fruitful exchanges and possible collaborations in the future." (*Id.* ¶ 123 (alterations in original)).

### 6.     Alleged Rape on April 12, 2022

"Primarily because of Covid-19 safety measures, [Plaintiff's] interactions with Moralez throughout 2020 and 2021 had been on zoom calls and email chains." (Dkt. No. 1, ¶ 139). Plaintiff "knew that Moralez was the primary professor outside of sociology who she was supposed to be engaging with as many faculty had already told her to do so."[6] (*Id.* ¶ 124). "Knowing she had failed to be a 'buddy' with Moralez as encouraged by superiors, and to 'welcome' him, and that she had to personally attend and observe one of his classes as well as develop courses together that she had not yet done, [Plaintiff] felt pressured to meet with Moralez in person." (*Id.* ¶ 124). "Because of this," on April 7, 2022, Plaintiff emailed Moralez to schedule an in-person meeting, (*id.* ¶ 125), and asked "if he wanted to meet for coffee or a meal to discuss working together on projects," (*id.* ¶ 147). "In response, Moralez proposed dinner,"

---

[6] Plaintiff does not identify the "faculty" who had advised her to engage with Moralez.

"mentioned his excitement to meet and talk with [Plaintiff], given their shared interests surrounding sociology and public health," and "suggested moving from email to private text messaging." (*Id.* ¶ 148). Plaintiff "suggested they meet at a restaurant or pick up takeout food to eat at a well-known public dining space adjacent to campus." (*Id.* ¶ 149). "Instead Moralez texted back that he would pick up Indian takeout, and that they should meet at his house instead." (*Id.* ¶ 150). They planned to meet at Moralez's house at 8:00 p.m., after Plaintiff's meeting with a student group ended. (*Id.* ¶ 151).

"In their exchanges leading up to the meeting, Moralez mentioned that he was cleaning his house." (*Id.* ¶ 153). Plaintiff "found this odd, and again offered to meet at a public spot" but "Moralez rejected this offer." (*Id.*).

Plaintiff arrived at Moralez's house the evening of April 12, 2022 with a "six pack of IPA beer." (*Id.* ¶ 158). Morales "had picked up Indian food for dinner." (*Id.* ¶ 158). They ate "across from one another at the island in the middle of the kitchen." (*Id.*). "Moralez did not sit down once during their conversation in the kitchen" and "continued to stand even as he ate his meal directly across from [Plaintiff]." (*Id.* ¶ 159). This made Plaintiff uncomfortable. (*Id.*). When "Moralez complained that he had no one to date," Plaintiff "tried to change the conversation" and they discussed "potential work collaborations, and thinking about her tenure track review, they talked about [Plaintiff] observing some of Moralez's classes." (*Id.* ¶ 160). At one point, Moralez commented "on a female colleague's weight and t[old] [Plaintiff] that he was going on a date with another faculty member." (*Id.* ¶ 161). Plaintiff "politely said that she felt some of the conversation was inappropriate." (*Id.*). Their "dinner and . . . discussion . . . lasted almost two hours," during which time, Plaintiff "drank two of the IPAs she brought." (*Id.* ¶ 162). They were still in the kitchen when Plaintiff "saw the clock" and said: "It is getting late, I should go." (*Id.* ¶

163). "Moralez objected and said, 'But you haven't tried my mixed drink.'" (*Id.*). After "Moralez acted offended that he could not show off his bartending skills," Plaintiff "relented and said that she would try one of his drinks." (*Id.* ¶ 164).

> Plaintiff described Moralez's preparation of the drink as follows:

> > Moralez kept his alcohol in a corner kitchen cabinet and went there to make Jane Doe's drink. From the refrigerator, Moralez removed a Tupperware container that looked to Ms. Doe like it contained grapefruit slices and returned to the corner countertop area, with his back to her, to mix her drink. Strangely, he then handed her a glass with grapefruit and clear alcohol and then placed the Tupperware container, ice and alcohol on the island because he said, she could make herself another drink when she was done. Again, politely she said there would not be a second drink and she needed to leave because it was late.

(*Id.* ¶ 165 (footnote omitted)). Plaintiff, "still sitting at the kitchen island, drank some of it." (*Id.* ¶ 166).

"In what seemed a very short time," Plaintiff "suddenly felt a wave of dizziness and unsteadiness wash over her as she sat there talking to Moralez." (*Id.* ¶ 167). Feeling "unwell," Plaintiff "went over to the water cooler" but "lacked the coordination to locate the water dispensing button" and "Moralez walked over himself to press it for her." (*Id.* ¶¶ 168–69). When Plaintiff "returned to the kitchen island," Moralez was "standing on the opposite side" and "leaned over and kissed" her. (*Id.* ¶ 171). "He then stood back and crossed his arms across his chest and stared at" Plaintiff. (*Id.*).

"[C]onfused and upset," Plaintiff "attempted to walk towards [the] back door where her car was located," but Moralez "stepped in between her and the door," blocking her exit, and "proceed[ed] to kiss [Plaintiff] again." (*Id.* ¶ 173). Plaintiff used "both her hands to try to push him away so she could get to the door" but Moralez put his arm around Ms. Doe and pulled her away from the door and back into the house while proclaiming, 'we're gonna have sex tonight.'"

(*Id.* ¶ 174). Plaintiff experienced "facial paralysis," and "she was unable to form words." (*Id.* ¶ 14). She was "guided by Moralez through his house and at some point, hazily remembers steep stairs." (*Id.*). Plaintiff was "unable to make her body move." (*Id.* ¶ 15).

"Over the next few hours, Ms. Doe came in and out of consciousness," and experienced "intermittent flashes of memory." (*Id.* ¶ 175–76). One memory Plaintiff recalled was "laying on her back and feeling her body jerk because Moralez was pulling her pants off," feeling "pain because Moralez did not unbutton her pants," and they "remained buttoned up as Moralez yanked them off." (*Id.* ¶ 176). Plaintiff's "next memory involves hearing bottles of lubricant clicking and then feeling Moralez put multiple fingers with lubricant inside of her vagina." (*Id.* ¶ 177). Plaintiff "recalls an intense pain that caused her to flinch." (*Id.*). "Moralez removed his fingers and proceeded to put his hand on Ms. Doe's head, pushing her face down his body and forcing her to give him oral sex." (*Id.* ¶ 178). Although terrified, "scared, and desperate to get out of there safely," Plaintiff "felt as if she could not move her body of her own volition." (*Id.* ¶ 179). Plaintiff "was willing herself to move but could not make it happen." (*Id.*). Moralez "penetrated her anally" and Plaintiff "begged Moralez to stop" but "was unable to physically fight back." (*Id.* ¶ 180). Moralez also "penetrated Ms. Doe vaginally" and "ejaculated inside of her, unprotected." (*Id.* ¶ 182). At no point did Plaintiff "consent[] to sex with Moralez." (*Id.* ¶ 24).

When Plaintiff regained "consciousness, she quickly gathered her clothes and got dressed so she could escape." (*Id.* ¶ 183). Plaintiff found "her pants and sweater," but "was so frightened that she rushed out of his room before she could even find her tank top" and went downstairs. (*Id.* ¶¶ 16, 183). "[A]fraid that Moralez would wake up come downstairs," Plaintiff "scribbled a

note on a napkin to say she had left, and ran to her car." (*Id.* ¶ 17). Plaintiff "remembers some of

the drive back to the [B&B] where she" was staying. (*Id.*).

Plaintiff "arrived back at the B&B" at "2 a.m., or later" and "unsuccessfully tried to

contact her husband." (*Id.* ¶ 185). Plaintiff's jeans "had a huge tear in the crotch" and "[h]er

sweater was torn at the neck." (*Id.* ¶ 25 n.3). Plaintiff "vomited violently at least twice and

experienced diarrhea the rest of the night" and slept "no more than a few hours." (*Id.* ¶ 185).

Plaintiff "felt sick the next day." (*Id.*).

### 7.    Plaintiff's Report to the University and Canton Police

The morning of April 13, 2022, Plaintiff "sent a voice memo to a close friend and said

that she had been sexually 'propositioned by a colleague' and 'then blacked out.'" (Dkt. No. 1, ¶

187). "Later that day," Plaintiff "began to remember some things that had happened the night

before" but she was [m]issing large chunks of time." (*Id.* ¶ 188). "Never before had she lost

consciousness from alcohol," which she believed "would require substantially more than two

beers consumed over a three-hour period." (*Id.* ¶ 189). Believing that talking to Moralez might

help her to "remember more about what had happened," she met Moralez in his office. (*Id.* ¶

190). Moralez "seemed carefree," "playful," and "happy" but "avoided eye contact" with

Plaintiff." (*Id.*). Moralez told Plaintiff that they were "two consenting adults," "she was a 'lucky'

woman because he would continue to have sex with her and he would not tell anyone," "that they

could 'bone any time,'" that "it was fun," "and that they had 'great, carnal sex.'" (*Id.* ¶¶ 24, 191).

Moralez told Plaintiff that they did "not have to have a 'relationship,'" and that he "really like[d]

her." (*Id.* ¶ 192).

Plaintiff then texted a friend, "to tell her that she was 'raped.'" (*Id.* ¶ 194). Plaintiff's

friend urged her to go to the hospital and the police. (*Id.* ¶ 195). "At approximately 4:00 p.m. on

April 13, 2022, [Plaintiff] arrived at the emergency room of Canton-Potsdam Hospital where she

had a rape kit performed" and "was prescribed HIV PEP and several STI prophylaxis." (*Id.* ¶ 196 (footnote omitted)).

On April 15, 2022, Plaintiff sent the following email to St. Lawrence's human resources department, her department head, and the associate dean for faculty affairs:

> Dr. Ernesto Moralez, Assistant Professor and co-Chair in Public Health, has committed sexual harassment, sexual assault, and rape against me . . . . This includes Moralez expressing sexually harassing verbal comments and initiating several forms of unwanted, nonconsensual sexual acts with me, including: kissing, touching, inserting fingers into my vagina, initiating anal sex, initiating vaginal sex, and reaching ejaculation inside of me without my consent or use of sexual protection. This occurred on Tuesday, April 12, 2022, between the hours of 8 pm and 2 am.

(*Id.* ¶ 200 (alteration in original)). Plaintiff missed classes and meetings "due to her need to receive medical care and emotional support related to the rape that she had experienced only a few days earlier" and was required by the University "to coordinate coverage" for these classes and meetings. (*Id.* ¶ 201).

Following her report, "members" of the University's "leadership began questioning" Plaintiff "and soliciting information from her." (*Id.* ¶ 206). No one at the University informed her that "the information she was providing," without counsel, "could and would be used against her in future litigation, as well as in" the University's "own Title IX process." (*Id.*). The University issued a "no contact order to Moralez" as to Plaintiff on her request. (*Id.* ¶ 208). During the investigation "St. Lawrence . . . grilled Ms. Doe . . . about what it considered 'inconsistencies' in her recollections about such things as 'how' she got from Moralez's kitchen up to his bedroom especially because the stairs were 'so steep,' to what she 'remembers' or not, about Moralez shoving her face down on to his penis." (*Id.* ¶ 30). The University reported that Moralez "purportedly remembered 'everything that was said.'" (*Id.* ¶ 29).

On April 17, 2022, Plaintiff "filed a police report with the Canton Police department, by phone, that detailed Moralez's rape of her." (*Id.* ¶ 209). On April 18, 2022, Plaintiff "went to the Canton Police Department for an in-person interview." (*Id.*).

### 8.      The University's Title IX Investigation

On April 17, 2022, Plaintiff received an email from Kimberly Flint-Hamilton, the University's Interim Title IX Coordinator, informing her "that a formal Title IX investigation had been opened." (Dkt. No. 1, ¶ 210). Because "[t]he University falsely told [Plaintiff] that she was prohibited from retaining her own legal counsel to assist her during the investigation process," Plaintiff "drafted emails about her best recollections and provided detailed information" without legal assistance. (*Id.* ¶ 211).

On April 20, 2022, Moralez was required to teach his classes remotely. (*Id.* ¶ 212). Plaintiff "was forced to take disability leave" due to physical and mental health symptoms and "need for continued medical care." (*Id.* ¶ 214).

On May 9, 2022, the University "confirmed that it was preparing a defense for the school rather than truly investigating [Plaintiff's] complaints," and "replaced its internal counsel with an outside law firm." (*Id.* ¶ 215).

On May 16, 2022, one of the University's attorneys told Plaintiff "she was not entitled to have an attorney in the Title IX process." (*Id.* ¶ 216). Plaintiff, however, had obtained copies of University policies, which stated "that a sexual assault complainant is entitled to have legal counsel." (*Id.* ¶ 217). Plaintiff emailed Flint-Hamilton and the University's attorneys "to provide them with the policy." (*Id.*). The same day, the University's attorneys sent Plaintiff an invite "to a zoom" meeting scheduled for May 17, 2022, "where, upon information and belief, the lawyers intended to continue [the University's] questioning" of Plaintiff. (*Id.* ¶ 218). Plaintiff responded

by requesting to reschedule the meeting and directing the attorneys to her May 16, 2022 email. (*Id.* ¶ 220).

On May 19, 2022, Flint-Hamilton gave Plaintiff the University's "Sexual Misconduct Prevention and Response booklet." (*Id.* ¶ 221). On May 20, 2022, the University's outside counsel gave Plaintiff "the guidelines concerning [her] right to have an [attorney] advisor during the investigation." (*Id.* ¶ 222).

On May 23, 2022, Plaintiff met with the University's attorneys and "gave a complete recounting of the sexual assault and related incidents, following her lengthy and detailed written account submitted in April." (*Id.* ¶ 223).

"On June 9, 2022, while Ms. Doe was out on disability leave, Rohlfsen, Co-Chair in Public Health with Moralez, sent Ms. Doe a work-related email that Rohlfsen jointly signed with Moralez." (*Id.* ¶ 224).

On June 9, 2022, Flint-Hamilton sent Plaintiff "an email admitting that mistakenly, she had told her that she was not entitled to her own legal counsel during the investigation." (*Id.* ¶ 226).

On June 17, 2022, Flint-Hamilton told Plaintiff that "Moralez was still being permitted to instruct students through remote classes." (*Id.* ¶ 227). On July 6, 2022, the University placed Moralez on paid administrative leave. (*Id.* ¶ 228).

In or about July 2022, the District Attorney's office investigating Plaintiff's police report issued a subpoena to the University. (*Id.* ¶ 244). To date, the University has not responded to the subpoena. (*Id.*).

The University completed its investigation "by October 2022." (*Id.* ¶ 243). On November 7, 2022, Plaintiff learned that the University's "investigators had prepared a summary report

about the investigation." (*Id.* ¶ 229). The summary did not contain information regarding the interview of Gagnon, the University official who allegedly failed to "adequately investigate the previous allegations of sexual misconduct that were made against Moralez." (*Id.*). The University has not explained why there has been a delay in issuing its findings. (*Id.* ¶ 234).

At the time the Complaint was filed, April 5, 2023, Moralez was "scheduled to teach a full load of courses in Fall 2023," including a course on campus. (*Id.* ¶ 237). Plaintiff is still required to obtain Moralez's approval for courses that serve as credits for a major or minor in Public Health. (*Id.* ¶ 237).

### B.    Counterclaims

#### 1.    April 12, 2022 Dinner at Moralez's House

On April 7, 2022, Plaintiff emailed Moralez "inviting him for coffee or a meal to belatedly welcome [him] to the" University. (Dkt. No. 12, ¶ 6).[7] Plaintiff and Moralez subsequently "exchanged text messages regarding where and when to meet." (*Id.* ¶ 6). Plaintiff suggested eating at the B&B near the University where she stayed when in Canton. (*Id.* ¶ 7). Moralez responded: "I'm good with the takeout idea. I could also host if you're comfortable with that." (*Id.*). Plaintiff replied: "that's fine with me if easiest" and "thanks for being flexible!" (*Id.*). Plaintiff indicated that "she would not be done on campus until after 8:00 pm." (*Id.*). Plaintiff offered to bring beer. (*Id.* ¶ 9). The parties agreed to meet for dinner on April 12, 2022, at Moralez's residence. (*Id.* ¶ 8)

Plaintiff arrived at Moralez's residence at approximately 8:00 p.m. "with 8 beers." (*Id.* ¶ 9). They "ate dinner, drank, and talked for a few hours." (*Id.* ¶ 10). They complained about a

---

[7] The Answer contains answering paragraphs and affirmative defenses, (Dkt. No. 12, at 1–28, ¶¶ 1–308), and separately numbered "Facts Common to All Counterclaims," (*id.* at 28–49, ¶¶ 1–116). All references in this Section are to the "Facts Common to All Counterclaims" set forth in Docket Number 12, on pages 28–49, in paragraphs 1–116.

sociology professor at the University and "discussed their personal lives." (*Id.* ¶¶ 11–12).
Plaintiff told Moralez about "her marital problems," including that "she was in a loveless
marriage," "her husband was an addict," and "she and her husband were separated." (*Id.* ¶ 12).
Plaintiff also told Moralez that she "had already dated someone else, but that it had not worked
out." (*Id.*). "At no point did [Plaintiff] seem incapacitated or even intoxicated." (*Id.* ¶ 13).

After dinner, "the Parties consensually kissed while in the kitchen." (*Id.*). Moralez invited
Plaintiff to spend the night and Plaintiff accepted. (*Id.*). "The Parties then went upstairs to
Moralez's bedroom and engaged in consensual sex." (*Id.*). Plaintiff "used the bathroom to urinate
after the sexual encounter." (*Id.*).

Plaintiff left Moralez's residence at approximately 2:00 a.m. (*Id.* ¶ 15). When Moralez
went downstairs the next morning, he "found a note from [Plaintiff] written on a paper towel
stating: "My shirt is somewhere (with a hand-drawn smiley face) [sic] Thanks for letting me
welcome you." (*Id.* (footnote omitted)).

### 2.  April 13, 2022 Interactions Between Plaintiff and Moralez

Plaintiff texted Moralez at 9:30 a.m. "asking if she could 'come over' to his residence."
(Dkt. No. 12, ¶ 16). Moralez replied that he was not at home but invited Plaintiff to meet on
campus. (*Id.*). They met in Moralez's office at approximately 10:30 a.m., Moralez offered to
walk Plaintiff back to her B&B, and Plaintiff agreed. (*Id.*).

During the walk to the B&B, the parties discussed the class Moralez would be teaching
that evening. (*Id.* ¶ 17). Plaintiff "offered to observe the class and give Moralez feedback and
Moralez accepted." (*Id.*). At the B&B, Plaintiff "invited Moralez to come to her room for another
sexual encounter" but Moralez declined. (*Id.*).

That same day, Plaintiff "went to Potsdam, New York to get a [Sexual Assault Nurse
Examiner ('SANE')] Exam." (*Id.* ¶ 18). "Upon information and belief [Plaintiff] declined a

toxicology screening and directed the nurse administering the SANE Exam to dispose of the toxicology sample." (*Id.*).

"On April 13, 2022, when upon information and belief Doe was undergoing the SANE exam, Doe sent Moralez the following text messages:

> 6:17 pm: I'm literally stuck in Potsdam but trying to make it
>
> 6:20 pm: I got a flat running errands! I'm pretty sure this has never happened to me
>
> 6:35 pm: I'm waiting (for AAA to repair her flat tire) what if I'm 30 late (to Moralez's class) still worth it or reschedule?
>
> 7:39 pm: I'm still here so sorry. AAA took a while getting to me I haven't left.

(*Id.* ¶ 19). Plaintiff arrived at Moralez's class at approximately 8:00 p.m. (*Id.* ¶ 20).

Plaintiff offered to drive Moralez home after class and Moralez accepted. (*Id.* ¶ 21). During the drive to Moralez's residence, they discussed a faculty member who had spoken with Moralez after his class about keeping his classroom door closed due to noise. (*Id.*). When Moralez commented that the "interaction with the other faculty member was strange," Plaintiff responded that she "assumed Moralez and the faculty member 'were fucking,'" and that "she assumed Moralez was sleeping with a lot of faculty members." (*Id.*).

When they arrived at Moralez's residence, Plaintiff "asked to go inside . . . but Moralez responded that he was tired and just wanted to go to sleep." (*Id.* ¶ 22). Plaintiff stayed for a "few minutes" to pet Moralez's dog and then left. (*Id.*).

### 3.   Plaintiff's Filing of Title IX Complaint and "Phone Chain" Reporting Alleged Rape to Faculty

On April 15, 2022, Plaintiff "filed a Title IX complaint alleging that her sexual encounter with Moralez was non-consensual." (Dkt. No. 12, ¶ 23). Plaintiff "initially alleged that she was

conscious and that her words and actions indicated consent but that she was having a trauma reaction." (*Id.*). Plaintiff "later claimed that she was drugged and incapacitated." (*Id.*).

On April 24, 2022, Moralez received a phone call from Assistant Professor of Psychology Brittany Hollis "to advise him that she had been contacted by a colleague to 'alert' her that [Moralez] had sexually assaulted [Plaintiff] and to be cautious because [Moralez] had not yet been arrested." (*Id.* ¶ 28). Moralez learned that "several women had been contacted and given a detailed description of the alleged assault, including that Moralez allegedly used force and that [Plaintiff] had turned in torn clothing to local police and completed a SANE exam at a local hospital." (*Id.*).

"Upon information and belief," Plaintiff contacted "Alanna Gillis, SLU Assistant Professor of Sociology and Reslie Cortes formerly of [St. Lawrence] and now at James Madison University, and falsely claimed that Moralez raped" her. (*Id.* ¶ 29). Plaintiff, Gillis, and Cortes "conspired together to make a phone chain . . . wherein they called certain female faculty members including Ms. Hollis to defame [Moralez] by stating, inter alia, that Moralez raped" Plaintiff, advising them "to use caution because Moralez had not been arrested yet," and encouraging them "to continue the Phone Chain to spread the word about Moralez."[8] (*Id.* ¶ 30).

"On or about April 25, 2022, Moralez's colleague Dr. Jessica Sierk, SLU Associate Professor of Education had dinner with Dr. Gillis." (*Id.* ¶ 33). "Prior to the dinner Dr. Gillis texted Dr. Sierk that there had been a sexual assault in their community, and "[d]uring the dinner . . . Dr. Gillis told Dr. Sierk that Plaintiff had informed her that Moralez had violently raped her." (*Id.* ¶¶ 34–35).

---

[8] "Dr. Gillis was motivated to defame and otherwise harm Moralez because [Plaintiff] disclosed to Dr. Gillis some of the complaints that Moralez made about Dr. Gillis during [Plaintiff's] dinner with Moralez on April 12, 2022." (Dkt. No. 12, ¶ 32). "Ms. Cortes was motivated to defame and otherwise harm Moralez as the two had kissed once and Ms. Cortes asked Moralez to be in a romantic relationship with Ms. Cortes and Moralez declined." (*Id.* ¶ 40).

"Over the following weeks Moralez was contacted by many friends and colleagues who heard the same rumors that Moralez violently assaulted a fellow professor." (*Id.* ¶ 37). "Dr. Gillis advised the Title IX investigators that Doe was upset and concerned that her encounter with Moralez could destroy her career at [the University] if Moralez weren't 'found guilty, fired, and arrested.'" (*Id.* ¶ 39).

Moralez emailed the University's Title IX Coordinator, Flint-Hamilton to "advise her of the defamatory phone calls and to ask if [the University] could intervene to stop the calls from continuing." (*Id.* ¶ 41). Flint-Hamilton responded "that nothing could be done about the Phone Chain." (*Id.*). Moralez received a similar response when he asked the University's director of human resources to intervene. (*Id.* ¶ 42). When Moralez advised "the outside Title IX investigators hired by" the University "about the Phone Chain," they responded that both "human resources and Title IX office should have intervened to stop the calls." (*Id.* ¶ 43).

"In approximately the end of April 2022, Doe posted a photo of herself on Facebook by a door with a sign that read 'Chief of Police' stating: 'Trying to contain my excitement. Pressing 1st and 2nd degree rape charges' with a flexed arm emoji." (*Id.* ¶ 45). Plaintiff "also posted: 'a colleague raped me anally and vaginally at work last week.'" (*Id.*).

### 4.    Alleged Online Stalking by "Amethyst Sands"

Beginning in 2017, Moralez "was contacted via direct messages on Twitter from someone claiming to have known [him] from the early 2000s," "Amethyst Sands,"[9] who wanted to reestablish contact and "thanked Moralez for being supportive and helpful." (Dkt. No. 12, ¶ 46). Moralez "thanked them for the message." (*Id.*). After the individual continued to send

---

[9] Moralez alleges that this individual, at times, utilized "Amethyst Sands" as a pseudonymous screen or account name. (Dkt. No. 12, ¶ 51). The Court utilizes this name for convenience.

"messages stating that they were lonely, very unhappy, and did not have much to live for,"
"Moralez responded that they should seek help but that he was not comfortable with them
messaging him and asked them to stop." (*Id.*). For "years," this individual continued to message
Moralez from different accounts using different aliases. (*Id.*). "Each time Moralez blocked an
account, he would receive messages from new accounts." (*Id.*).

"At one point, Moralez was contacted via Twitter by an individual claiming to be a
professor at New Mexico State University (where Moralez was teaching at the time), making
sexual harassment allegations against him." (*Id.* ¶ 47). "When Moralez emailed the professor,
she denied sending the messages and told him the account was fake." (*Id.*).

In April 2021, a University colleague told Moralez "that a Snap Chat account using
Moralez's face and name was used to direct message the colleague and had asked them personal
questions." (*Id.* ¶ 48). "Moralez had not sent the messages and upon information and belief the
messages were sent by" Amethyst Sands. (*Id.*).

On or about April 23, 2021, when the University "congratulated Moralez on Twitter for
receiving a teaching award," Amethyst Sands "left comments on [the] tweet linking to tweets
accusing Moralez of sexual harassment from 2005." (*Id.* ¶ 49 (footnote omitted)). "There were
similar posts on Facebook." (*Id.*).

"On or about May 3, 2021, Moralez received 16 messages from 'Amethyst Sands,'; the
messages "detailed some of the misconduct committed by [Sands], including impersonating a
New Mexico State University professor and using multiple social media accounts and names to
harass Moralez." (*Id.* ¶ 51). Amethyst Sands "also made Twitter accounts using Moralez's name
and likeness, and these accounts have been used to contact other accounts and post comments."
(*Id.* ¶ 52).

On November 18, 2021, the University "Office of Safety and Security received an email . . . from someone impersonating one of Moralez's students accusing him of sexual harassment." (*Id.* ¶ 53). When the University "contacted the student, . . . the student denied sending any such email and further denied that the Gmail address used in the subject email belonged to her." (*Id.*).

On November 19, 2021, Moralez received an email from Amethyst Sands "apologizing for contacting Moralez's friends and writing that [Sands] . . . 'ha[s]n't been ok for a while'" and admitting "to impersonating people to get his attention." (*Id.* ¶ 54).

"At various times in 2021 Moralez contacted the [University] Office of Safety and Security, the Canton Police Department, the New Mexico Police Department[,] New Mexico State University, and eventually the FBI about the harassment." (*Id.* ¶ 50).

Moralez "had previously confided in Ms. Cortes" about the online harassment he was experiencing. (*Id.* ¶ 55). After Plaintiff "defamed Moralez to [University] faculty," Cortes shared the information Moralez had confided with Plaintiff "and others." (*Id.* ¶ 55). Plaintiff, Cortes, and Gillis "conspired together to contact" Amethyst Sands "and asked her to share things about Moralez including the fabricated story that Moralez sexually harassed students at a high school he worked at in 2005 in New Mexico." (*Id.* ¶ 55 (footnote omitted)).

On May 19 and 20, 2022, Amethyst Sands used "a new Twitter account using the name 'Amethyst' . . . and the fake Twitter accounts with Moralez's name and likeness . . . to reach out to" one of Moralez's friends in California and the two daughters of a friend in New Mexico." (*Id.* ¶ 56). Plaintiff saw these messages and on May 20, 2022, Plaintiff sent the following messages via Facebook to the daughters of Moralez's friend in New Mexico:

> I'm really sorry to reach out but do you know Ernesto Moralez? I saw that he sent you a message on twitter. He's currently under criminal and title ix investigation for rape and I'm his most recent victim. I wanted to warn you and also encourage you to talk with me

> if your comfortable here or I can send you email/phone. This is
> probably strange but he and I are both professors and it looks like
> you might be a student? Please take care and do reach back out if
> you can.

(Dkt. No. 12, at 49).

"In December 2022, a Tweet was posted to the St. Lawrence University Twitter page from an account with Moralez's name and likeness confessing to raping Jane Doe." (*Id.* ¶ 60). "Flint-Hamilton told Moralez that the tweet had been investigated and that [the University] concluded that Moralez was not responsible for posting the tweet" and that the account did not belong to Moralez. (*Id.*).

## III.    STANDARD OF REVIEW

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must provide 'enough facts to state a claim to relief that is plausible on its face.'" *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A motion to dismiss a counterclaim "is evaluated using the same standard as a motion to dismiss a complaint." *A.V.E.L.A., Inc. v. Est. of Marilyn Monroe, LLC*, 131 F. Supp. 3d 196, 203 (S.D.N.Y. 2015). "Although a complaint need not contain detailed factual allegations, it may not rest on mere labels, conclusions, or a formulaic recitation of the elements of the cause of action, and the factual allegations 'must be enough to raise a right to relief above the speculative level.'" *Lawtone-Bowles v. City of New York*, No. 16-cv-4240, 2017 WL 4250513, at *2, 2017 U.S. Dist. LEXIS 155140, at *5 (S.D.N.Y. Sept. 22, 2017) (quoting *Twombly*, 550 U.S. at 555). A court must accept as true all well-pleaded factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *See EEOC v. Port Auth.*, 768 F.3d 247, 253 (2d Cir. 2014) (citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)). However, "the tenet that a

court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678.

## IV.     THE UNIVERSITY'S MOTION TO DISMISS THE COMPLAINT

### A.     Materials Outside the Pleadings

In support of its motion to dismiss, St. Lawrence has filed a declaration by Flint-Hamilton, (Dkt. No. 22-3), and eight exhibits, (Dkt. No. 22-4). Plaintiff objects to any consideration of the exhibits and asserts that while the Complaint may "briefly mention[]" some of the documents, it did not incorporate these documents by reference, and argues that they are not integral to the Complaint. (Dkt. No. 33, at 45–47). As discussed below, with the exception of Plaintiff's April 15, 2022, email reporting the alleged sexual assault, none of the exhibits the University has submitted are incorporated in or integral to the Complaint.

"Generally, consideration of a motion to dismiss under Rule 12(b)(6) is limited to consideration of the complaint itself," *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006), and "documents attached to the complaint as exhibits," *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010). However, considering "materials outside the complaint is not entirely foreclosed on a 12(b)(6) motion." *Faulkner*, 463 F.3d at 134. A complaint "is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230 (2d Cir. 2016) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002)). "To be incorporated by reference, the complaint must make a clear, definite and substantial reference to the document[]." *Lateral Recovery, LLC v. Cap. Merch. Servs., LLC*, No. 21-cv-9336, 2022 WL 4815615, at *20, 2022 U.S. Dist. LEXIS 181044, at *64 (S.D.N.Y. Sept. 30, 2022) (quoting *McKeefry v. Town of Bedford*, 2019 WL 6498312, at *3, 2019 U.S. Dist. LEXIS 207874, at *7 (S.D.N.Y. Dec. 2, 2019)). "Where a document is not incorporated by reference, the court may nevertheless consider

24

it where the complaint relies heavily upon its terms and effect, thereby rendering the document integral to the complaint." *Nicosia*, 834 F.3d at 230 (quoting *DiFolco v.*, 622 F.3d at 111 (internal quotation marks omitted)). "Merely mentioning a document in the complaint will not satisfy this standard; indeed, even offering 'limited quotation[s]' from the document is not enough." *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (alteration in original). Rather, the contents of a document must "appear to have been necessary to the 'short and plain statement of the claim showing that [a plaintiff is] entitled to relief.'" *Lateral Recovery*, 2022 WL 4815615, at *20, 2022 U.S. Dist. LEXIS 181044, at *64 (alteration in original) (quoting *Sahu v. Union Carbide Corp.*, 548 F.3d 59, 68 (2d Cir. 2008)). That is, "'[a] necessary prerequisite' to a finding that materials are integral to a complaint 'is that the "plaintiff[] rel[y] on the terms and effect of [the] document in drafting the complaint.'" *Id.*, 2022 WL 4815615, at *20, 2022 U.S. Dist. LEXIS 181044, at *65 (alteration in original) (quoting *Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 156 (2d Cir. 2006)). However, even where a document is integral to the complaint, it must be "clear" that "no dispute exists regarding the authenticity or accuracy of the document" and that "there exist no material disputed issues of fact regarding the relevance of the document." *Faulkner*, 463 F.3d at 134. "[I]f material is not integral to or otherwise incorporated in the complaint, it may not be considered unless the motion to dismiss is converted to a motion for summary judgment and all parties are 'given a reasonable opportunity to present all the material that is pertinent to the motion.'" *Nicosia*, 834 F.3d at 231 (quoting Fed. R. Civ. P. 12(d)).

To begin, as Flint-Hamilton's declaration dated June 1, 2023, post-dates the April 5, 2023, Complaint and is not incorporated in or integral to the Complaint, the Court does not consider it. The University seeks to rely on two of its policies in support of its motion to dismiss:

the "Combined Discrimination and Harassment Policies," (Dkt. No. 22-4, at 2–33), and the

"Procedures Under the Nondiscrimination, Discriminatory Harassment or Sexual Misconduct

Policies," (Dkt. No. 22-4, at 35–64). The Complaint references the University's processes and

policies a number of times, but does so in a limited, conclusory manner. (*See*, *e.g.*, Dkt. No. 1, ¶¶

206 (referring to the University's "own Title IX process"), 217 (alleging that Plaintiff "on her

own had obtained copies of SLU policies that explicitly state that a sexual complainant is entitled

to have legal counsel"), 218 (alleging that Plaintiff was questioned by University lawyers

without the "legal counsel that she was entitled to have under SLU's own policies"), 219

(alleging that the University failed to "play by the Title IX rules), 221 (alleging that the Title IX

coordinator gave her the University's "Sexual Misconduct Prevention and Response booklet" on

May 19, 2022), 222 (alleging that on May 20, 2022, the University's "outside counsel gave Ms.

Doe the guidelines concerning Ms. Doe's right to have an advisor during the investigation

process"), 252, 262 (alleging in her Title VII and NYSHRL retaliation claims that the University

failed to comply with its own policies and practices)). The Complaint's limited references to the

University's policies, and absence of explicit reference to either of the policies the University

filed in support of its motion, are insufficient to render the policies integral to, or incorporated in,

the Complaint. While it may well be that the "Sexual Misconduct Prevention and Response

booklet," Plaintiff received on May 19, 2022, (Dkt. No. 1, ¶ 222), and the "Procedures Under the

Nondiscrimination, Discriminatory Harassment or Sexual Misconduct Policies," (Dkt. No. 22-4,

at 35–64), that the University filed are one and the same, given the Complaint's limited

discussion of this policy, the Court has no basis for concluding that they are the same document.

Moreover, both of the policies that the University submitted are dated 2020—two years prior to

the alleged April 12, 2022 sexual assault. The Court therefore declines to rely on either document.

The University has also filed an email dated April 5, 2022, (Dkt. No. 22-4, at 93–97), an email thread dated April 15, 2022, including the email in which Plaintiff reported her alleged sexual assault, (*id.* at 66–75), a second email thread dated April 15, 2022, (*id.* at 77–78), a letter from the University dated April 18, 2022, concerning the filing of a formal complaint against Moralez, (*id.* at 80–82), a second version of the April 18, 2022, letter, "Updated May 10, 2022," (*id.* at 88–91), an email dated April 18, 2022, (*id.* at 83–86), and a confidential investigation report, (*id.* at 98). Of these exhibits, only Plaintiff's April 15, 2022, email reporting the alleged sexual assault may properly be considered in connection with the University's motion.

The email dated April 5, 2022, is from Cheryl Proof, Executive Secretary, Academic Affairs, (*id.* at 93), and includes, as an attachment, Plaintiff's Mid-Probationary Review Evaluation dated April 4, 2022 and "Prepared by: Cynthia A. Bansak," (*id.* at 94–97). The Complaint recounts Plaintiff's April 4, 2022 mid-year tenure review meeting, (Dkt. No. 1, ¶¶ 4, 71), but only references the written component of the review twice, and in a cursory manner, (*id.* ¶¶ 123, 146). Indeed, the Complaint quotes only one sentence from the written review, (*id.* ¶ 123), which is more than three pages long and single-spaced, (Dkt. No. 22-4, 94–97). The two conclusory references and single quote are insufficient to show that that the April 4, 2022, written review is integral to the Complaint. *See Goel*, 820 F.3d at 559.

The first April 15, 2022 email, (Dkt. No. 22-4, at 68–75), contains Plaintiff's April 15, 2022 email reporting the alleged April 12, 2022, incident. The Complaint twice quotes an entire paragraph from the seven-page email, (Dkt. No. 1, ¶¶ 2, 200), and Plaintiff alleges that she "wrote a brutally honest and descriptive account of what she remembered from April 12 and sent

an email with this information to Human Resources and to her department head and the Associate Dean for Faculty Affairs," (*id.* ¶ 200). Given the Complaint's reliance on Plaintiff's April 15, 2022, email reporting the alleged sexual assault, the Court concludes it is integral to the Complaint and properly considered in connection with the University's motion to dismiss. Plaintiff has not identified any concerns regarding the authenticity or accuracy of this email. The reply emails following Plaintiff's initial email, (Dkt. No. 22-4, at 66–67), are not integral to the Complaint, and the Court therefore does not consider these emails.

The second April 15, 2022, email thread concerns the no-contact order Plaintiff obtained as to Moralez, and Plaintiff's taking medical leave. Although the Complaint references a no-contact order and taking medical leave generally, (Dkt. No. 1, ¶¶ 208, 214), it does not reference any emails on these subjects. Thus, the Court does not consider these emails.

Finally, the University seeks to rely on its April 18, 2022 letter notification regarding the filing of a formal complaint against Moralez, (Dkt. No. 22-4, at 80–82), the email to which it was attached, (*id.* at 83), and the "Updated May 10, 2022" version of the April 18, 2022 letter, (*id.* at 88–91). As none of these documents is referenced in the Complaint, the Court does not consider them in connection with the present motion.

### B.    Title VII Hostile Work Environment

The University moves to dismiss Plaintiff's Title VII and Title IX discrimination and retaliation claims. (Dkt. No. 22-1). Plaintiff opposes the University's motion. (Dkt. No. 33).

The University argues that Plaintiff fails to allege a gender-based disparate treatment claim, a direct gender discrimination claim, a quid pro quo claim, or a hostile work environment claim. (Dkt. No. 22-1, at 16–24). Plaintiff has not responded to the University's arguments regarding disparate treatment, intentional discrimination, or quid pro quo theories of liability under Title VII; she opposes the University's motion solely on the ground that the Complaint

alleges a plausible hostile work environment claim. (Dkt. No. 33, at 18–24). Thus, to the extent the Complaint alleges disparate treatment, intentional discrimination, or quid pro quo theories of liability under Title VII, the Court deems those claims abandoned and dismisses them. *See Moccio v. Cornell Univ.*, No. 09-cv-3601, 2009 WL 2176626, at *4, 2009 U.S. Dist. LEXIS 62052, at *12 (S.D.N.Y. July 21, 2009) ("Whatever the merit of [the defendants'] argument [for dismissal], plaintiff has abandoned the . . . claim, as her motion papers fail to contest or otherwise respond to defendants' contention.") *aff'd*, 526 F. App'x 124 (2d Cir. 2013) (summary order); *Brandon v. City of New York*, 705 F. Supp. 2d 261, 268 (S.D.N.Y. 2010) (dismissing claims as abandoned where the plaintiff "did not raise any arguments opposing Defendants' motion regarding these . . . claims") (citing cases); *Barmore v. Aidala*, 419 F. Supp. 2d 193, 201–02 (N.D.N.Y. 2005) ("The failure to oppose a motion to dismiss a claim is deemed abandonment of the claim.") (internal citation omitted).

"To establish a hostile work environment under Title VII . . . a plaintiff must show that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Littlejohn v. City of New York*, 795 F.3d 297, 320–21 (2d Cir. 2015) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). In general, "this conduct 'must be more than episodic; [it] must be sufficiently continuous and concerted in order to be deemed pervasive.'" *Cadet v. All. Nursing Staffing of N.Y., Inc.*, 632 F. Supp. 3d 202, 228 (S.D.N.Y. 2022) (quoting *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002)). However, as the Second Circuit has recognized, a single incident of egregious conduct can create a hostile work environment. *Mathirampuzha v. Potter*, 548 F.3d 70, 79 (2d Cir. 2008) ("A 'single incident of rape . . . sufficiently alters the conditions of the victim's employment and clearly creates an

abusive work environment for purposes of Title VII liability' for sex-based discrimination."
(quoting *Ferris v. Delta Air Lines, Inc.*, 277 F.3d 128, 136 (2d Cir. 2001))). The hostile work
environment "standard has both objective and subjective components: the conduct complained of
must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and
the victim must subjectively perceive the work environment to be abusive." *Littlejohn*, 795 F.3d
at 321 (quoting *Raspardo v. Carlone*, 770 F.3d 97, 114 (2d Cir. 2014). "Moreover, to hold an
employer liable for such a hostile work environment, federal law requires the plaintiff to show 'a
specific basis for imputing the conduct creating the hostile work environment to the employer.'"
*Bentley v. AutoZoners, LLC*, 935 F.3d 76, 90 (2d Cir. 2019) (quoting *Summa v. Hofstra Univ.*,
708 F.3d 115, 124 (2d Cir. 2013)). "Two such bases exist: strict vicarious liability if an
employer's supervisor has created the hostile environment, and negligence if a co-worker who is
not a supervisor has created the hostile environment, and the employer, upon becoming aware of
the misconduct, fails to remedy it." *Id.* at 91 (internal citations omitted) (first citing *Wiercinski v.
Mangia 57, Inc.*, 787 F.3d 106, 113 (2d Cir. 2015); and then citing *Summa*, 708 F.3d at 124).

Before turning to the merits of Plaintiff's hostile work environment claim, the Court
addresses the University's argument that because Plaintiff's hostile work environment claim
stems from off-campus, nonwork-related, conduct, there is no basis for holding it liable under
Title VII. (Dkt. No. 22-1, at 22–24). Indeed, "[c]onduct wholly outside of the workplace has
been held insufficient to form the basis of a hostile work environment claim." *Whipple v. Reed
Eye Assocs.*, 524 F. Supp. 3d 76, 90 (W.D.N.Y. 2021) (quoting *Vereen v. City of New Haven
Public Works Dep't*, No. 17-cv-1509, 2018 WL 950117, at *2, 2018 U.S. Dist. LEXIS 26304 , at
*3 (D. Conn. Feb. 20, 2018)); *see also Devlin v. Teachers' Ins. & Annuity Ass'n of America*, No.
02-cv-3228, 2003 WL 1738969, at *2, 2003 U.S. Dist. LEXIS 5226, at *7 (S.D.N.Y. Apr. 2,

2003) ("As a general rule, employers are not responsible under Title VII for hostile sexual acts resulting from nonwork-related, off-duty interactions between co-workers, because those actions are not part of the work environment") (internal quotation marks omitted).

In addition to off-campus conduct, Plaintiff cites Moralez's conduct on campus, in his office, on April 13, 2022—namely, the comments he allegedly made to her, including that "she was a 'lucky' woman because he would continue to have sex with her and he would not tell anyone," that "they could 'bone any time' and that they had 'great, carnal sex.'" (Dkt. No. 1, ¶ 191). Plaintiff further alleges that Moralez's continued presence on campus even after she had filed her report alleging rape, and the email she received that was ostensibly signed by Moralez even though the no contact order was in place, contributed to the hostile work environment. (*Id.* ¶¶ 202, 213, 224). The Court therefore concludes that Plaintiff has sufficiently alleged Moralez's off-campus conduct permeated her workplace with sex-based "discrimination, intimidation, ridicule, and insult." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 102 (2d Cir. 2010) (quoting *Demoret v. Zegarelli*, 451 F.3d 140, 149 (2d Cir. 2006)); *see also*, *e.g.*, *Whipple*, 524 F. Supp. 3d at 90–91 (finding, at summary judgment stage, alleged events that occurred outside the workplace relevant to the plaintiff's hostile work environment claim as they form "part of the 'totality of the circumstances' concerning whether a hostile work environment claim has been established"). Accordingly, the Court finds the University's argument without merit at this stage of the proceedings.

The allegations that Moralez drugged and raped Plaintiff at his house and then made sexually aggressive comments suggesting additional sexual conduct the next day in his office are sufficient to allow a plausible inference that Moralez's conduct was "so egregious" that, even though the alleged rape may have occurred off official University premises, Moralez's conduct

as a whole "actually alter[ed] the conditions of the school [or work] environment." *Ocasio v. Mohawk Valley Cmty. Coll.*, No. 20-cv-1355, 2021 WL 4477241, at *14, 2021 U.S. Dist. LEXIS 187890, at *38–39 (N.D.N.Y. Sept. 30, 2021) (alterations in original) (emphasis omitted) (quoting *Andersen v. Rochester City Sch. Dist.*, No. 09-cv-6259, 2011 WL 1458068, at *5, 2011 U.S. Dist. LEXIS 41184, at *13 (W.D.N.Y. Apr. 15, 2011)). Plaintiff alleges that "when combined with what Moralez had done to her the night before, the words and his motives openly communicated to her, threatened her physical safety and her job." (Dkt. No. 1, ¶ 191). Thus, the alleged rape together with Moralez's alleged sexual comments the next day in his office, which Plaintiff subjectively perceived as threatening, are sufficient to allow a plausible inference of a hostile work environment.

The University next argues that the Complaint fails to allege any basis for imputing hostile work environment liability to the University for Moralez's alleged conduct as a supervisor or co-worker. (Dkt. No. 22-1, at 20–22 (asserting that the Complaint's "vague, general and conclusory assertions regarding Moralez's level of authority over Plaintiff" fail to "plausibly allege Moralez was her 'supervisor' for purposes of [strict vicarious liability under] Title VII"). Under Title VII, a "supervisor" is defined as an employee "empowered . . . to take tangible employment actions against the victim, i.e., to effect a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Vance v. Ball State Univ.*, 570 U.S. 421, 431 (2013) (quotation marks omitted). "The hallmark of the tangible employment action thus used to identify a supervisor is its potential 'to inflict direct economic injury.'" *Bentley*, 935 F.3d at 91 (quoting *Vance*, 570 U.S. at 440).

Here, the Complaint alleges that Moralez was the Co-Chair of Public Health, that ten of the twelve courses Plaintiff had taught at the University since 2020 "were requisites of a major or minor in Public Health," and required Moralez's approval, and that Moralez "had . . . reviewed and approved [Plaintiff's] pedagogy." (Dkt. No. 1, ¶¶ 4, 124, 131, 133). It further alleges that the evaluation and approval of course content provides an opportunity for the Chair to "critique and weigh in on another professor's performance," and that "[s]uch evaluations and assessments directly impact a professor's tenure and promotional reviews." (*Id.* ¶ 133–134; *see also id.* ¶ 142 (Moralez's review of Plaintiff "would have considerable influence in connection with her promotional potential and tenure application"). The Complaint also alleges that Moralez "had access to department heads during the monthly department Chair meetings and related committees." (*Id.* ¶ 144). At most, these allegations allow a plausible inference that as a Co-Chair of Public Health, Moralez had the authority to review and approve Plaintiff's courses and pedagogy whether Plaintiff would teach those courses, (*id.* ¶¶ 4, 124, 133); that without Moralez's approval, Plaintiff's Sociology crossover courses would not carry Public Health credit; that evaluations of Plaintiff impact a tenure decision; and that Moralez had an opportunity to provide such an evaluation. But there is no allegation, for example, that Plaintiff could not teach her Sociology courses at all without Moralez's approval, or that teaching a crossover course comes with a financial or other tangible benefit. Nor is there any allegation describing the decisionmaking power over Plaintiff's tenure and promotion. Moralez's ability to provide an evaluation to the decision makers is insufficient to plausibly allege that he is a supervisor under *Vance*. Thus, the Court concludes that Plaintiff fails to allege sufficient facts that would allow a plausible inference that Moralez was a supervisor. *See Sykes v. Rachmuth*, No. 22-cv-3989, 2023 WL 2752865, at *10, 2023 U.S. Dist. LEXIS 57052, at *28–29 (S.D.N.Y. Mar. 31, 2023)

(finding allegations that "senior case consultant coordinator" who subjected the plaintiff, an administrative assistant, to a hostile work environment was "ranked higher" and held "a position senior to," and had "real and apparent authority" over, the plaintiff, failed to allow plausible inference that "senior case consultant" was "'empowered by the employer to take tangible employment actions against the victim,' as is required to establish that she was the plaintiff's supervisor." (quoting *Vance*, 570 U.S. at 424)).

Thus, to impute liability to the University, Plaintiff must allege that the University, "upon becoming aware of the misconduct, fails to remedy it." *Bentley*, 935 F.3d at 91. "In assessing whether an employer has taken appropriate remedial action, courts are instructed to examine whether the response was 'immediate or timely and appropriate in light of the circumstances, particularly the level of control and legal responsibility [the employer] has with respect to [the employee's] behavior.'" *Blue v. City of Hartford*, No. 18-cv-974, 2019 WL 7882565, at *14, 2019 U.S. Dist. LEXIS 227033, at *36 (D. Conn. Oct. 22, 2019) (quoting *Summa*, 708 F.3d at 124); *see Cowan v. City of Mount Vernon*, No. 14-cv-8871, 2017 WL 1169667, at *5, 2017 U.S. Dist. LEXIS 45812, at *16 (S.D.N.Y. Mar. 28, 2017) ("Where the offensive behavior occurs at the hands of a co-worker, 'the employer is liable only if it was negligent in controlling working conditions'" (quoting *Vance,* 570 U.S. at 424)).

Plaintiff's allegations regarding the University's response to her April 15, 2022 report of the alleged rape are sufficient to allow a plausible inference that the University's response was negligent. Plaintiff has alleged, among other things: that the University allowed Moralez to remain on campus, teach classes, and meet with students after Plaintiff reported the alleged rape, (Dkt. No. 1, ¶¶ 197, 200–01); that the University failed to protect Plaintiff from receiving work-related email from Moralez, which violated the no-contact order, (*id.* ¶¶ 208, 224); that the

University did not place Moralez on administrative leave until July 6, 2022, nearly three months after Plaintiff's report, (*id.* ¶ 228); that as of fall 2023, the University was permitting Moralez to return to campus, where he would be teaching "nearby" where Plaintiff would be teaching, (*id.* ¶ 237); that the University had not, as of the date of filing of the instant Complaint, issued any findings on Plaintiff's report, (*id.* ¶ 233); and that the University is continuing to require Plaintiff to obtain Moralez's approval for crossover courses, (*id.* ¶ 237). *See Blue*, 2019 WL 7882565, at *14, 2019 U.S. Dist. LEXIS 227033, at *37 (agreeing that the plaintiff adequately alleged that the defendant's response to the plaintiff's harassment complaint was not reasonable where the defendant "initiated an internal investigation," but "did not take any action after learning of the result of the investigation," and "even 10 months after the alleged assault and nearly six months after the recommendation was made for [alleged harasser's] termination, no disciplinary action or counseling had taken place"). Accordingly, the University's motion to dismiss Plaintiff's Title VII hostile work environment claims is denied.

### C.   Title VII and Title IX Retaliation Claims

The University moves to dismiss Plaintiff's Title VII retaliation claim on the ground that Plaintiff fails to allege adverse action, that its alleged failure to properly investigate Plaintiff's rape allegation does not qualify as an adverse action, and that Plaintiff fails to allege a "retaliatory investigation." (Dkt. No. 22-1, at 27–29). Plaintiff opposes the University's motion. (Dkt. No. 33, at 42–45).

Title VII states that "[i]t shall be an unlawful employment practice for an employer to discriminate against any . . . employees . . . because [s]he has opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3a. "Title VII and Title IX are governed by the same substantive

standards for reviewing claims of . . . retaliation." *Summa*, 708 F.3d at 131. "Thus, for a Title VII [or Title IX] retaliation claim to survive a motion to dismiss, the plaintiff must plausibly allege that: (1) defendants discriminated—or took an adverse employment action—against h[er], (2) 'because' [s]he has opposed any unlawful employment practice." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 90 (2d Cir. 2015); *see Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81, 91 (2d Cir. 2011) ("As in the context of Title VII, a plaintiff claiming retaliation under Title IX must first establish a prima facie case by showing: (1) protected activity by the plaintiff; (2) knowledge by the defendant of the protected activity; (3) adverse school-related action; and (4) a causal connection between the protected activity and the adverse action.").

Generally, "an adverse employment action is any action that 'could well dissuade a reasonable worker from making or supporting a charge of discrimination.'" *Vega*, 801 F.3d at 90 (quoting *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006)). "This definition covers a broader range of conduct than does the adverse-action standard for claims of discrimination under Title VII: '[T]he antiretaliation provision, unlike the substantive [discrimination] provision, is not limited to discriminatory actions that affect the terms and conditions of employment.'" *Id.* (quoting *Burlington Northern*, 548 U.S. at 64). The Supreme Court has explained that it has:

> phrase[d] the standard in general terms because the significance of any given act of retaliation will often depend upon the particular circumstances. Context matters. "The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of words used or the physical acts performed."

*Burlington Northern*, 548 U.S. at 69 (quoting *Onacle v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81–82 (1998)). To determine "whether conduct amounts to an adverse employment action, the alleged acts of retaliation need to be considered both separately and in the aggregate, as even minor acts can be sufficiently 'substantial in gross' as to be actionable." *Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010).

"To adequately plead causation, 'the plaintiff must plausibly allege that the retaliation was a "but-for" cause of the employer's adverse action.'" *Duplan v. City of New York*, 888 F.3d 612, 625 (2d Cir. 2018) (quoting *Vega*, 801 F.3d at 90). However, "'[b]ut-for' causation does not . . . require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive." *Id.* (quoting *Vega*, 901 F.3d at 91). "A retaliatory purpose can be shown indirectly by timing: protected activity followed closely in time by adverse employment action," *Vega*, 801 F.3d at 90, or "directly through evidence of retaliatory animus directed against the plaintiff by the defendant." *Littlejohn*, 795 F.3d at 319 (quoting *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000)).

Plaintiff argues that University's "investigatory failures . . . constitute an adverse employment action." (Dkt. No. 33, at 44). Specifically, Plaintiff asserts the University conducted a "sham" investigation, falsely told her she was prohibited from obtaining counsel, failed to inform Plaintiff of her rights under Title IX for more than a month, failed to properly enforce a no contact order, and made "false and demeaning claims about" Plaintiff's "private life" in the summary report released by the University's defense counsel. (*Id.*). Plaintiff further asserts that the University also "refused to respond to the district attorney's subpoena." (*Id.*).

To the extent Plaintiff claims the University's "sham" investigation is an adverse action, taken in retaliation for her April 15, 2022, complaint, she fails to state a plausible claim for relief. In *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712 (2d Cir. 2010), the plaintiff brought a claim for retaliation under § 1981, alleging that she complained of discrimination and the defendant failed to investigate that complaint, in retaliation for her complaint. *Id.* at 721. The Second Circuit affirmed summary judgment in the defendant's favor, finding that, in general, "an employer's failure to investigate a complaint of discrimination cannot be considered an adverse employment action taken in retaliation for the filing of the same discrimination complaint." *Id.* The Second Circuit explained that "[a]n employee whose complaint is not investigated cannot be said to have thereby suffered a punishment for bringing that same complaint: Her situation in the wake of her having made the complaint is the same as it would have been had she not brought the complaint or had the complaint been investigated but denied for good reason or for none at all." *Id.* Thus, unless the employer's failure to investigate is alleged to be "in retaliation for some separate, protected act by the plaintiff," the complaint fails to state a claim retaliatory failure to investigate. *Id.* at 722. Court have applied these principles to claims of insufficient investigations. *See also Sawka v. ADP, Inc.*, No. 13-cv-754, 2015 WL 5708571, at *18, 2015 U.S. Dist. LEXIS 130932, at *62 (D. Conn. Sept. 29, 2015) (applying *Fincher* in concluding that the plaintiff's allegation that the defendant "conducted a subpar investigation of the complaint . . . cannot constitute an adverse action for the purposes of a retaliation claim, because they are not '[a]ffirmative efforts to punish a complaining employee,' nor do they contain a 'threat of further harm'" (quoting *Fincher*, 604 F.3d at 721)); *Atencio v. U.S. Postal Serv.*, No. 14-cv-7929, 2015 WL 7308664, at *9, 2015 U.S. Dist. LEXIS 156686, at *25 (S.D.N.Y. Nov. 19, 2015) (granting motion to dismiss retaliation claim, explaining that

"unless the employer's failure to investigate is alleged to be 'in retaliation for some separate, protected act by the plaintiff,'" allegations that the employer "inadequately investigated her claims by narrowly construing them," fail to allege the requisite adverse action for a retaliation claim). Thus, Plaintiff's allegation of a "sham" investigation fails to allege adverse action for purposes of her retaliation claim.

However, the Second Circuit has cautioned that "an employer's investigation may constitute a cognizable retaliatory action if carried out so as to result in a hostile work environment, constructive discharge, or other employment consequences of a negative nature, or if conducted in such an egregious manner as to 'dissuade a reasonable worker from making or supporting a charge of discrimination.'" *Cox v. Onondaga Cnty. Sheriff's Dep't*, 760 F.3d 139, 147 (2d Cir. 2014) (quoting *Burlington Northern*, 548 U.S. at 57). Plaintiff also alleges that the "outside lawyers[']" questioning of her, without a lawyer, about "the alleged physical harm" Plaintiff purportedly "inflicted on" Moralez, knowing she "had a limited memory of what happened outside of flashbacks." (Dkt. No. 1, ¶ 230). This is insufficient. *See Ray v. New York State Ins. Fund*, No. 16-cv-2895, 2018 WL 3475467, at *12, 2018 U.S. Dist. LEXIS 120728, at *32 (S.D.N.Y. July 18, 2018) (concluding that alleged "interrogation" could not sustain retaliation claim, explaining that "[e]ven accepting [the plaintiff's] characterization of the interview, an interrogation of the type described does not constitute an adverse employment action as a matter of law, especially when it was unaccompanied by any further consequences"). Plaintiff's allegation that Defendant included false, personal information in the November 7, 2022 summary report also fails to allow a plausible inference of adverse action. The excerpts Plaintiff identifies in the Complaint as demeaning appear to be quotes or summaries of Moralez's statements to investigators. (Dkt. No. 1, ¶ 230). In general, conduct "which could be found to be

offensive, discourteous, demeaning, and/or belittling" does not constitute an adverse employment action for the purposes of a retaliation claim. *Sangan v. Yale Univ.*, No. 06-cv-587, 2008 WL 350626, at \*4, 2008 U.S. Dist. LEXIS 8973, at \*12 (D. Conn. Feb. 7, 2008). Nor is the violation of the no contact order, which consisted of Co-Chair Rholfsen sending Plaintiff "a work-related email that Rohlfsen jointly signed with Moralez. (Dkt. No. 1, ¶ 224). Plaintiff alleges this was traumatizing, but the sending of a single work-related email signed by Moralez appears to have been a one-time incident and there are no allegations that it had any impact on Plaintiff's employment.

Finally, even viewed as a whole, Plaintiff's allegations fail to allege an adverse action. As Plaintiff alleges no adverse action, her retaliation claim, under Title VII and Title IX, must be dismissed.

### D.    Title IX Discrimination Claim

Plaintiff claims that she "was discriminated against on the basis of her sex at Defendant St. Lawrence, including but not limited to by sexual misconduct, sexual harassment and sexual assaults by Defendant Moralez." (Dkt. No. 1, ¶¶ 269–75). The University argues that Plaintiff's Title IX claim must be dismissed because: (1) the University "cannot be vicariously liable under Title IX" for Moralez's conduct; (2) Plaintiff fails to state a plausible claim of intentional discrimination; (3) Plaintiff fails to state a claim for deliberate indifference for "peer-on-peer sexual harassment"; and (4) "Plaintiff fails to allege a plausible claim against SLU under a pre-assault theory of liability" or "post assault" theory of liability. (Dkt. No. 22-1, at 29–49).

Title IX provides, with certain exceptions not relevant here: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). "Because Title VII's discrimination prohibition

overlaps Title IX's prohibition against sex discrimination in education programs, and because employment discrimination claims often have much in common with claims under Title IX," courts in the Second Circuit "have . . . long interpreted Title IX 'by looking to . . . the caselaw interpreting Title VII.'" *Vengalattore v. Cornell Univ.*, 36 F.4th 87, 103 (2d Cir. 2022) (quoting *Menaker v. Hofstra Univ.*, 935 F.3d 20, 31 (2d Cir. 2019)). Sexual harassment is a "form of discrimination prohibited by Title IX." *Posso v. Niagara Univ.*, 518 F. Supp. 3d 688, 696 (W.D.N.Y. 2021) (citing *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 649–50 (1999)).

The University argues at the outset that because "none of Moralez's conduct occurred on-campus or in connection with an SLU activity or program," Plaintiff's Title IX claim must be dismissed. (Dkt. No. 22-1, at 35–36). In light of the allegations that the alleged perpetrator was the Co-Chair of a subject area where Plaintiff, an assistant professor, regularly taught courses, that the purpose of their dinner was to discuss "working together on projects," (Dkt. No. 12, ¶ 147), and that they met at the Co-Chair's home, which the University had "paid for" during his entire first year, (*id.* ¶ 154), the Court declines to find that dismissal is required based solely on the location of the alleged rape. *Cf. Doe v. Yeshiva Univ.*, No. 22-cv-5405, 2023 WL 8236316, at *5, 2023 U.S. Dist. LEXIS 211425, at *14–15 (S.D.N.Y. Nov. 28, 2023) (rejecting the university's argument that Title IX did not apply because the alleged incident took place off campus, explaining that "lawmakers did not condition a district court's power to adjudicate a dispute invoking Title IX on the situs, context, or degree of control that the institution exercised over the alleged violation"); *see also Crandell v. N.Y. Coll. of Osteopathic Med.*, 87 F. Supp. 2d 304, 316 (S.D.N.Y. 2000) ("Courts frequently have upheld sexual harassment claims under Title IX where some or all of the alleged misconduct occurred off campus. In all of those cases, the perpetrator was a faculty or staff member at the federally funded institution, and the plaintiff

alleged that the off campus incidents had created a hostile environment in the institution."). Further, Plaintiff alleges that the off-campus incident created a hostile educational environment at the University, including when, the day after the alleged rape, Moralez made sexual comments to her in his office on campus, the University did not immediately issue a no contact order and permitted Moralez to remain and teach on campus for several days after she filed her report. *See Yeshiva Univ.*, 2023 WL 8236316, at *5, 2023 U.S. Dist. LEXIS 211425, at *15 (allowing Title IX claim to proceed where the plaintiff sought "to impose liability on Yeshiva not only for the off-campus rape . . . but also for the direct actions of Yeshiva, including deliberate indifference in the conduct and outcome of the investigation and alleged acts of retaliation").

"[A] Title IX hostile education environment claim is 'governed by traditional Title VII hostile environment jurisprudence.'" *Papelino*, 633 F.3d at 89 (quoting *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 744 (2d Cir. 2003)). "In order to state a claim for violation of Title IX, a plaintiff must demonstrate that: [i] she is a member of a protected group; [ii] she was subjected to unwelcome sexual harassment in the form of sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature; [iii] the harassment was based on sex; [iv] the harassment was sufficiently severe or pervasive so as to alter the conditions" of her employment "and create an abusive educational environment; and [v] some basis for institutional liability has been established." *Folkes v. N.Y. Coll. of Osteopathic Med. of N.Y. Inst. of Tech.*, 214 F. Supp. 2d 273, 281-82 (E.D.N.Y. 2002) (citing *Babcock v. Frank*, 783 F. Supp. 800, 808 (S.D.N.Y. 1992)).

Here, Plaintiff sufficiently alleges the first four factors, specifically, that she is a member of a protected group, that Moralez allegedly raped her and made sexually aggressive comments to her in his office after the alleged rape, that the alleged conduct was based on sex, and that

Plaintiff was "forced to take disability leave due to physical and mental health symptoms that she

was experiencing as a result of the sexual assault and related trauma and her need for continued

medical care." (Dkt. No. 1, ¶ 214). "With regard to the final factor, to establish institutional

liability for sexual harassment under Title IX, the plaintiff must show that 'an official who has

authority to address the alleged discrimination and to institute corrective measures on the

institutional recipient's behalf has actual knowledge of discrimination and fails adequately to

respond." *Hauff v. State Univ. of N.Y.*, 425 F. Supp. 3d 116, 136 (E.D.N.Y. 2019) (quoting

*Campisi v. City Univ. of N.Y.*, 2016 WL 4203549, at *4, 2016 U.S. Dist. LEXIS 105078, at *11

(S.D.N.Y. 2016)). "A school fails to adequately respond if it provides no response or if it

provides a response that amounts to deliberate indifference to discrimination. The school's

response to sex discrimination must be clearly unreasonable in light of known circumstances."

*Papelino*, 633 F.3d at 89 (internal quotation marks and citations omitted).

### 1.     Pre-Assault Deliberate Indifference

Plaintiff appears to base her pre-assault theory of liability on both a policy of deliberate

indifference to sexual assault by the University and its alleged failure to respond to notice it

received from New Mexico State University that Moralez had sexually harassed a student at a

high school where he previously taught. (Dkt. No. 33, at 34–40). The University argues that the

Complaint's allegations are insufficient to allege pre-assault deliberate indifference. (Dkt. No.

22-1, at 44–49).

"Pre-assault cases have found that universities may be held responsible for its pre-assault,

deliberate indifference when they have 'actual knowledge of sexual assault(s) committed in a

*particular* context or program or by a *particular* perpetrator or perpetrators.'" *Roskin-Frazee v.

Columbia Univ.*, No. 17-cv-2032, 2018 WL 6523721, at *5, 2018 U.S. Dist. LEXIS 28937, at

*14 (S.D.N.Y. Nov. 26, 2018) (emphasis in original) (quoting *Tubbs v. Stony Brook Univ.*, No.

15-cv-0517, 2016 WL 8650463, at *9, 2016 U.S. Dist. LEXIS 28465, at *26 (S.D.N.Y. Mar. 4,

2016)). "A defendant acts with deliberate indifference for Title IX purposes 'when the

defendant's response to known discrimination is *clearly* unreasonable in light of the known

circumstances.'" *Roskin-Frazee*, 2018 WL 6523721, at *4, 2018 U.S. Dist. LEXIS 28937, at *11

(emphasis in original) (citing *Gant ex rel. Gant v. Wallingford Bd. Of Educ.*, 195 F.3d 134, 141

(2d Cir. 1999)). "The clearly unreasonable standard requires more than mere negligence; 'it is a

high standard that seeks to eliminate any risk that an educational institution would be liable in

damages not for its own official decision but instead for [another individual's] independent

actions.'" *Posso v. Niagara Univ.*, 518 F. Supp. 3d 688, 697 (W.D.N.Y. 2021) (quoting *Roskin-*

*Frazee*, 2018 WL 6523721, at *4, 2018 U.S. Dist. LEXIS 28937, at *12).

Plaintiff alleges that the University has been the target of on-campus campaigns and

protests regarding its "pervasive rape culture" and its handling of complaints of sexual assault

and that it was the subject of a report by North Country Public Radio that indicated the

University was "focused on SLU's reputation rather than the victims of assault." (Dkt. No. 1, ¶¶

46–52). However, these allegations suggest only a general knowledge of sexual assault and a

deficient response, and are thus insufficient to allege the University's actual knowledge for

purposes of Title IX liability. *See Roskin-Frazee*, 2018 WL 6523721, at *5, 2018 U.S. Dist.

LEXIS 28937, at *15–16 (finding "general allegation that Defendant has been the target of

multiple student-led complaints and protests due to its discouragement of students from reporting

on-campus sexual misconduct, and its failure to adequately respond" insufficient to plead pre-

assault, Title IX liability, noting that "some greater specificity . . . is required to satisfy the actual

knowledge requirement [for Title IX liability]") (second alteration in original) (quoting *Tubbs*,

2016 WL 8650463, at *9, 2016 U.S. Dist. LEXIS 28465, at *27).

As to the University's pre-assault knowledge regarding Moralez in particular, Plaintiff alleges that the University received direct notice from an alleged victim of sexual harassment in an educational environment (high school), in May 2021, (Dkt. No. 1, ¶ 89), as well as two direct communications regarding this matter from NMSU, (*id.* ¶¶ 99–100), where Moralez had been previously employed, but dropped the inquiry after inquiring of Moralez and unsuccessfully attempting to contact the individual who made the social media posts, without contacting the high school where Moralez was previously employed, (*id.* ¶¶ 100–06). As the Court's review is confined to the facts alleged in the Complaint, and must draw all reasonable inferences in Plaintiff's favor, the Court concludes these allegations, which are particular to Moralez, are sufficient to nudge Plaintiff's pre-assault deliberate indifference claim across the line from conceivable to plausible. *JD1 v. Canisius Coll.*, No. 21-cv-521, 2022 WL 2308902, at *9–10, 2022 U.S. Dist. LEXIS 113451, at *29–30 (W.D.N.Y. June 27, 2022) (finding allegations that college "fail[ed] to respond" to a female student athlete's report to assistant coach of sexual harassment in connection with the athletic program and to anonymous reports of sexual misconduct by male student athletes, prior to sexual assault of second female student athlete, were "sufficient to nudge . . . pre-assault claim across the line from conceivable to plausible"). The University's motion to dismiss Plaintiff's Title IX claim based on pre-assault deliberate indifference is therefore denied.

### 2.      Post-Assault Deliberate Indifference

The University argues that Plaintiff fails to allege facts showing that it "was deliberately indifferent in response to her Formal Complaint." (Dkt. No. 22-1, at 36–44). Plaintiff argues that she has plausibly alleged that the District was deliberately indifferent in its response to the harassment Plaintiff experienced.

As stated, an educational institution is deliberately indifferent to sexual harassment when its actions are "clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648–49. It is well-settled that this is not a "mere reasonableness standard." *See Doe v. Patrick*, 437 F. Supp. 3d 160, 181 (N.D.N.Y. 2020) (quoting *Nungesser v. Columbia Univ.*, 244 F. Supp. 3d 345, 362 (S.D.N.Y. 2017)). "Title IX does not require schools to 'remedy peer harassment' or to 'ensure that students conform their conduct to certain rules.'" *Id.* (citations omitted). Rather, deliberate indifference must, "at a minimum, cause students to undergo harassment or make them liable or vulnerable to it." *KF ex rel. CF v. Monroe Woodbury Centr. Sch. Dist.*, No. 12-cv-2200, 2013 WL 177911, at *6, 2013 U.S. Dist. LEXIS 7269, at *15–16 (S.D.N.Y. Jan. 16, 2013) (quoting *Davis*, 526 U.S. at 645). The "measures taken must be so inadequate that a degree of discriminatory intent may be inferred." *Id.* (citations omitted). Deliberate indifference is "often a fact-laden question, for which bright lines are ill-suited." *Tesoriero v. Syosset Centr. Sch. Dist.*, 382 F. Supp. 2d 387, 398 (E.D.N.Y. 2005) (citations and internal quotation marks omitted).

Plaintiff alleges the University failed to "immediately remove Moralez from campus," (Dkt. No. 1, ¶ 202), the University failed to "immediately seize [Moralez's University-]owned devices and subject them to forensic review of websites he had visited in the past months, including any in which date rape drugs can be purchased," (*id.* ¶ 203), that Gagnon, whom she describes as a "key witness," was not interviewed as part of the investigation, (*id.* ¶ 229), the University repeatedly told her she was not allowed to have an attorney present during the investigative process, (*id.* ¶ 211), the University's "outside lawyers insisted on questioning [Plaintiff] about the alleged physical harm she inflicted on [Moralez] . . . without allowing her to have a lawyer interject or be involved," (*id.* ¶ 230), the Title IX coordinator did not give Plaintiff the University's "Sexual Misconduct Prevention and Response booklet" until May 19, 2022,

more than a month after Plaintiff reported the alleged rape, (*id.* ¶ 221), the University failed to properly enforce the no-contact order by allowing a work-related email co-signed by Moralez to reach her, (*id.* ¶ 224), and the University failed to respond to the district attorney's subpoena, (*id.* ¶ 244). While the facts, viewed individually, may not suggest more than negligence, viewing the allegations as a whole and drawing all inferences in Plaintiff's favor, the Court concludes, at this early stage of the litigation, the facts alleged are sufficient to allow a plausible inference of deliberate indifference in response to her report. *Cf., Tubbs*, 2016 WL 8650463, at *7, 2016 U.S. Dist. LEXIS 28465, at * 20 (denying motion to dismiss where complaint alleged "(1) campus police did not explain Tubbs' options to her or take photographs of her bruising stemming from the alleged assault, (2) [the university] failed to notify Tubbs' professors of her ongoing hardship, despite their offer to do so, (3) [the university] took over 3 months to complete an investigation and hold a disciplinary hearing, (4) Tubbs was required to present her case and question her attacker in the middle of her final exam period, and (5) Tubbs was not allowed to have her therapist present at the proceeding for emotional and mental support").

Accordingly, the University's motion to dismiss Plaintiff's Title IX claim based on post-assault conduct is denied.

## E. New York State Law Claims

The University asserts that in the event the Court determines "that none of Plaintiff's federal claims can withstand this motion," it should "dismiss the remaining causes of action for lack of subject matter jurisdiction." (Dkt. No. 22-1, at 49). As several of Plaintiff's federal claims proceed, the University's motion to dismiss Plaintiff's state law claims is denied.

## F. Leave to Amend

Plaintiff requests leave to file an amended complaint "[s]hould the Court dismiss any of Plaintiff's claims." (Dkt. No. 33, at 17 n.3). Under Federal Rule of Civil Procedure 15(a), absent

certain circumstances not at play here, a party may amend its pleading only with the opposing

party's written consent or the court's leave. Fed. R. Civ. P. 15(a)(1)–(2). Rule 15(a)(2) requires

that a court "freely give leave when justice so requires." *See McCarthy v. Dun & Bradstreet

Corp.*, 482 F.3d 184, 200 (2d Cir. 2007). But a court may, in its discretion, deny leave to amend

"for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing

party." *MSP Recovery Claims, Series LLC v. Hereford Ins. Co.*, 66 F.4th 77, 90 (2d Cir. 2023).

Here, because Plaintiff has requested leave to amend and has not yet had an opportunity

to amend, and because it is not apparent that amendment would be futile, that Plaintiff has

engaged in bad faith or undue delay, or that Defendants would be unduly prejudiced, the Court

grants Plaintiff's request for leave to amend the Complaint.

## V.     PLAINTIFF'S MOTION TO DISMISS COUNTERCLAIMS

Plaintiff moves to dismiss Moralez's defamation counterclaim on the grounds that it

violates "New York's Amended Anti-SLAPP Statute" and "fails to plead the elements of a

defamation claim," (Dkt. No. 32-1, at 16–27); tortious interference of contract claim on the

ground that Moralez "fails to allege when or how SLU 'ceased performance' of its contract with

Moralez, much less [Plaintiff's] involvement," (*id.* 27–28); intentional infliction of emotional

distress claim because he has failed to plead outrageous conduct, (*id.* at 28–29); and civil

conspiracy claim on the ground "that it is not an independent cause of action," (*id.* at 29–31).

Moralez opposes Plaintiff's motion. (Dkt. No. 40).

### A.     Defamation

Moralez's defamation claims are based on: (1) Plaintiff's alleged statement in "Facebook

Messages" to the daughters of two of Moralez's friends that Moralez was "currently under

criminal and title ix investigation for rape" and that Doe was Moralez's "most recent victim,"

(Dkt. No. 12, ¶ 68; *id.* at 49); and (2) the "Phone Chain" Plaintiff allegedly formed with other

professors to inform "certain female faculty members" that "Moralez raped Doe and to use caution because Moralez had not been arrested yet," (*id.* ¶¶ 28–30). Plaintiff argues for dismissal on the grounds that: (1) her statements fall within New York's "Strategic Lawsuits Against Public Participation" statute ("anti-SLAPP statute"), N.Y. Civ. Rights Law §§ 70-a, 76-a, which require Moralez to "prove by clear and convincing evidence that Ms. Doe acted with actual malice" and to "demonstrate" that his defamation claims "have a substantial basis in law," and Moralez's defamation counterclaims fail to meet these standards, (Dkt. No. 32-1, at 16–21); (2) her statements are subject to New York's Absolute Privilege law, N.Y. Civ. Rights Law § 74. Moralez opposes Plaintiff's motion to dismiss. (Dkt. No. 40, at 13–25).

### 1.     Anti-SLAPP Law

"The New York anti-SLAPP law expands the category of claims that must plead actual malice" to include "any action 'involving public petition and participation,' . . . based on 'any communication in a place open to the public or a public forum in connection with an issue of public interest.'" *Margolies v. Rudolph*, No. 21-cv-2447, 2022 WL 2062460, at *6, 2022 U.S. Dist. LEXIS 103369, at *16 (E.D.N.Y. June 6, 2022) (quoting N.Y. Civ. Rights Law § 76-a(1)(a)(1)–(2)). The anti-SLAPP law states that: "'Public interest' shall be construed broadly, and shall mean any subject other than a purely private matter." N.Y. Civ. Rights Law § 76-a(1)(d).

Plaintiff argues that her alleged statements regarding rape by another professor at the University, both on Facebook and to other professors within the University community, involve a matter of public concern and were made in a public forum within the meaning of the anti-SLAPP law. (Dkt. No. 32-1, at 17–20). Moralez disputes the applicability of the anti-SLAPP statute, arguing Plaintiff did not post her statements on Facebook but sent them via private

messages and that Plaintiff's Phone Chain statements were "made to a limited private audience [and] did not involve matters of public concern." (Dkt. No. 40, at 13–15).

"Matters of 'public concern' include 'matter[s] of political, social, or other concern to the community,' even those that do not 'affect the general population.'" *Kesner v. Buhl*, 590 F. Supp. 3d 680, 693 (S.D.N.Y. 2022) (quoting *Abbott v. Harris Publ'ns, Inc.*, No. 97-cv-7648, 2000 WL 913953, at *7, 2000 U.S. Dist. LEXIS 9384, at *22 (S.D.N.Y. July 7, 2000)), *aff'd sub nom. Kesner v. Dow Jones & Co., Inc.*, No. 22-875, 2023 WL 4072929, 2023 U.S. App. LEXIS 15255 (2d Cir. June 20, 2023). "Courts have found 'sexual impropriety and pressure in [a certain] industry[,]' especially 'amid the rising tide of public concern over workplace sexual harassment known as the #MeToo movement[,]' to be matters of 'public interest.'" *Watson v. NY Doe 1*, No. 19-cv-533, 2023 WL 6540662, at *3, 2023 U.S. Dist. LEXIS 180671, at *11 (S.D.N.Y. Oct. 6, 2023) (quoting *Coleman v. Grand*, 523 F. Supp. 3d 244, 259 (E.D.N.Y. 2021)); *see also id.*, 2023 WL 6540662, at *3, 2023 U.S. Dist. LEXIS 180671, at *11 (observing that "courts have found 'Facebook and LinkedIn posts accusing [an individual] of sexual assault' to be 'communications concern[ing] an issue of public interest.'" (quoting *Goldman v. Reddington*, No. 18-cv-3662, 2021 WL 4099462, at *4, 2021 U.S. Dist. LEXIS 171340, at *10 (E.D.N.Y. Sept. 9, 2021)). Because, as discussed below, *see infra* Section V.A.2., Moralez's counterclaims adequately allege "actual malice," the Court need not determine, at this juncture, whether Plaintiff's alleged statements involve matters of public concern or were made in a public forum within the meaning of New York's anti-SLAPP law.

Plaintiff additionally argues that, in order to avoid dismissal, the anti-SLAPP law requires Moralez to show that there is a "substantial basis" for his defamation claim. (Dkt. No. 32-1, at 20–21); *see* N.Y. Civ. Rights Law § 70-a(1)(a) (citing N.Y. C.P.L.R. § 3211(g)). The New York

anti-SLAPP statute provides that a court "must grant a motion to dismiss unless the proponent of

the action, claim, cross-claim, or counterclaim can demonstrate at the pleading stage that 'the

cause of action has a substantial basis in law or is supported by a substantial argument for an

extension, modification or reversal of existing law.'" *Watson*, 2023 WL 6540662, at \*6, 2023

U.S. Dist. LEXIS 180671, at \*18 (quoting N.Y. C.P.L.R. § 3211(g)(1)). The "substantial basis"

standard, however, conflicts with Rule 12(b)(6), under which a litigant need only allege facts that

"state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6); *see also Twombly*, 550

U.S. at 570 (explaining that a plaintiff at the pleadings stage need only allege "enough facts to

state a claim to relief that is plausible on its face"). Thus, even when federal courts have found

communications subject to New York's anti-SLAPP law, they have rejected the "substantial

basis" standard on the ground that it imposes a higher burden on the pleading party than, and

conflicts with the pleading standards articulated in, Rule 12(b)(6). *See Watson*, 2023 WL

6540662, at \*6, 2023 U.S. Dist. LEXIS 180671, at \*18–19 (finding the "substantial basis"

standard inapplicable and that "the appropriate standard is the Rule 12(b)(6) standard"); *see also*

*Nat'l Acad. of Television Arts & Scis., Inc. v. Multimedia Sys. Design, Inc.*, 551 F. Supp. 3d 408,

432 (S.D.N.Y. 2021) (finding that "substantial basis" standard articulated in New York's anti-

SLAPP law "is inapplicable in federal court"); *Maron v. Legal Aid Soc'y*, 605 F. Supp. 3d 547,

567 n.11 (S.D.N.Y. 2022) (same). Accordingly, even assuming Plaintiff's alleged statements fall

within New York's anti-SLAPP statute, Moralez need only satisfy the pleading standards

articulated in Rule 12(b)(6).

## 2. Defamatory Statements

In New York, "[d]efamation is 'the making of a false statement which tends to expose the

plaintiff to public contempt, ridicule, aversion or disgrace, or induce an evil opinion of him in the

minds of right-thinking persons, and to deprive him of their friendly intercourse in society.'"

*Stepanov v. Dow Jones & Co.*, 120 A.D.3d 28, 34 (1st Dep't 2014) (quoting *Foster v. Churchill*, 87 N.Y.2d 744, 751 (1996)). "Statements that falsely charge plaintiffs with 'serious' criminal activity are defamatory per se." *Goldman v. Reddington*, 417 F. Supp. 3d 163, 171 (E.D.N.Y. 2019). To establish a defamation claim, a plaintiff must show: "(1) a false statement that is (2) published to a third party (3) without privilege or authorization, and that (4) causes harm, unless the statement is one of the types of publications actionable regardless of harm." *Elias v. Rolling Stone LLC*, 872 F.3d 97, 104 (2d Cir. 2017).

"Despite its name, the actual malice standard does not measure malice in the sense of ill will or animosity, but instead the speaker's subjective doubts about the truth of the publication." *Church of Scientology Int'l v. Behar*, 238 F.3d 168, 174 (2d Cir. 2001) (citing *Masson v. New Yorker Mag.*, 501 U.S. 496, 510 (1991)). "In recognition of the fact that 'a defendant in a defamation action will rarely admit that she published the statements with actual malice,' proof of actual malice rests on objective facts, such as 'the defendant's own actions or statements, the dubious nature of [her] sources, [and] the inherent improbability of the story.'" *Kesner v. Buhl*, 590 F. Supp. 3d 680, 694 (S.D.N.Y. 2022) (first quoting *Biro v. Conde Nast*, 807 F.3d 541, 545 (2d Cir. 2015); and then quoting *Coleman*, 523 F. Supp. 3d at 260).

### a.   Facebook Messages

To begin, Moralez does not challenge the truth of the first portion of the allegedly defamatory sentence in Plaintiff's Facebook message to "Mia" and "Emma," namely, that Moralez was "under criminal and title ix investigation for rape." (Dkt. No. 12, at 49). It is the second portion of that sentence—"and I'm his most recent victim"—that Moralez claims that Plaintiff subjectively knew to be false. (*Id.*). Given Moralez's allegations that on the night of April 12, 2022, Plaintiff was not "incapacitated or even intoxicated," Moralez, accepted Moralez's invitation "to spend the night," "went upstairs" with Moralez, "and engaged in

consensual sex," (Dkt. No. 12, ¶ 13), it is plausible to infer that that Plaintiff knew Moralez did

not rape her and thus made the allegedly defamatory statement, that she was "his most recent

victim," with actual malice. *See Watson v. NY Doe 1*, 439 F. Supp. 3d 152, 164 (S.D.N.Y. 2020)

(finding the plaintiff adequately alleged that the defendant "made the defamatory statements with

. . . actual malice" where "the alleged false statements were allegedly based on the direct

knowledge of the alleged defamer" who "knew that the plaintiff did not rape her but falsely made

that accusation"); *see also*, *e.g.*, *Goldman*, 417 F. Supp. 3d at 173 (concluding that if, as the

plaintiff claimed, the defendant "did in fact knowingly lie" in stating that the plaintiff sexually

assaulted her, the defendant could be liable for defamation). Accordingly, Plaintiff's motion to

dismiss Moralez's defamation counterclaims is denied as to the Facebook Messages to "Mia"

and Emma.

### b.    Phone Chain

Plaintiff seeks dismissal of the Phone Chain claims on the grounds that, in addition to

failing to allege actual malice, Moralez fails to allege the actual words spoken, and, in some

cases, who spoke them. Moralez opposes dismissal. Moralez's defamation claims based on the

alleged "Phone Chain" fail to state a claim. Indeed, the majority of Moralez's "Phone Chain"

allegations either fail to identify the speaker or otherwise allege that the speaker was a non-party.

For example, Moralez alleges that he received a phone call from an Assistant Professor Brittany

Hollis, who "advise[d] him that she had been contacted by a colleague to 'alert' her that

[Moralez] had sexually assaulted Jane Doe." (Dkt. No. 12, ¶ 28). This allegation does not

identify the "colleague" who made the statement to Hollis and Hollis is not a party to this action.

Likewise, the allegation that Plaintiff, and two other professors, "conspired together to make a

phone chain . . . wherein they called certain female faculty members" and "state[d], inter alia,

that Moralez raped" Plaintiff, (*id.* ¶ 30), does not identify who made the allegedly defamatory

phone calls or who was called, indicate when the calls were made, or provide any specifics as to what was stated. *Rodgers-King v. Candy Digital Inc.*, No. 23-cv-2591, 2024 WL 382092, at *8, 2024 U.S. Dist. LEXIS 17920, at *21–22 (S.D.N.Y. Feb. 1, 2024) (finding allegations that the defendant corporation "told others that [the plaintiff's] performance had been a problem and that he had threatened to leave [the corporation]" failed to identify "who at [the corporation] made the alleged statements, nor does it state when the statements were made" and thus lacked "the requisite specificity" to state a defamation claim). And while Moralez's allegations regarding the communications between Dr. Gillis and Dr. Sierk contain more specifics, (Dkt. No. 12, ¶¶ 34–35 (alleging on or about April 25, 2022, Assistant Professor Alanna Gillis and Assistant Professor Sierk had dinner, that prior to the dinner, Gillis texted Sierk that there "had been a sexual assault in their community," and that at the dinner Gillis told Sierk "that Doe had informed her that Moralez had violently raped Doe")), Moralez does not identify a legal theory for holding Plaintiff liable for Gillis's statements to Sierk. Finally, although the allegations that "Doe contacted [Gillis] and Reslie Cortes formerly of SLU and now at James Madison University, and falsely claimed that Moralez raped Doe," (*id.* ¶ 29), identifies the speaker as Plaintiff, and the substance of the communication, it does not allege the manner in which Plaintiff "contacted" Gillis and Cortes, i.e., whether the statements were made in-person or via text, telephone, or email and does not indicate when Plaintiff made this communication. *See*, *e.g.*, *Tannerite Sports, LLC v. NBCUniversal News Grp.*, 864 F.3d 236, 251 (2d Cir. 2017) ("Vagueness as to the complained-of conduct is particularly inappropriate when pleading a defamation claim."); *see also Ives v. Guilford Mills, Inc.*, 3 F. Supp. 2d 191, 199 (N.D.N.Y. 1998) (dismissing slander claim where the "plaintiff [did] not allege[ ] any specific places or times"). With out more, Moralez fails to provide Plaintiff "sufficient notice of the communications complained of to

enable [her] to defend [herself]." *Biro v. Conde Naste*, 883 F. Supp. 2d 441, 456 (S.D.N.Y. 2012). Accordingly, Plaintiff's motion to dismiss Moralez's defamation counterclaims is granted as to the Phone Chain claims.

### 3.    Privilege

Plaintiff argues that under New York Civil Rights Law § 74, her statements concern reports of official proceedings and are therefore privileged. Section 74 provides that "[a] civil action cannot be maintained against any person, firm or corporation, for the publication of a fair and true report of any judicial proceeding, legislative proceeding or other official proceeding, or for any heading of the report which is a fair and true headnote of the statement published." "New York law recognizes certain privileges that shield an individual from liability for defamation." *Sheindlin v. Brady*, 597 F. Supp. 3d 607, 629 (S.D.N.Y. 2022). "The purpose of the statute in part is to implement the public policy in favor of encouraging publication and dissemination of judicial decisions and proceedings as being in the public interest." *Beary v. West Publ'g Co.*, 763 F.2d 66, 68 (2d Cir. 1985). The privilege extends to "statements published not only by the media, but also by parties or their counsel." *Wexler v. Allegion (UK) Ltd.*, 374 F. Supp. 3d 302, 311 (S.D.N.Y. 2019). Here, the Facebook messages appear to concern both official proceedings and the alleged underlying conduct. *Wexler*, 374 F. Supp. 3d at 312 ("'If context indicates that a challenged portion of a publication focuses exclusively on underlying events, rather than an official proceeding relating to those events, that portion is insufficiently connected to the proceeding to constitute a report of that proceeding.'" (quoting *Fine v. ESPN, Inc.*, 11 F. Supp. 3d 209, 217 (N.D.N.Y. 2014)). Accordingly, the Court declines to dismiss on the basis of privilege at this stage of the proceedings. *See Cojocaru v. City Univ. of N.Y.*, No. 19-cv-5428, 2020 WL 5768723, at *5, 2020 U.S. Dist. LEXIS 118907, at *14 (S.D.N.Y. Sept. 28, 2020) (declining to dismiss defamation counterclaims on ground that the plaintiffs' allegedly false

interviews, social media posts, and text messages were privileged under § 74 of the N.Y. Civil Rights Law because they were "reports on official proceedings, including the investigation conducted by CUNY" and other entities, explaining that, among other things, the plaintiffs' statements were "context-dependent and" involved "disputed questions of fact that cannot be resolved at the pleading stage").

### B.  Intentional Infliction of Emotional Distress

Plaintiff moves for dismissal of Moralez's intentional infliction of emotional distress claim on the ground that "Moralez's allegations in support of IIED are the same allegations he uses to allege defamation" and that there is "nothing outrageous or atrocious for a victim of a rape to want justice in the form of our criminal system holding her perpetrator accountable." (Dkt. No. 32-1, at 28–29). Moralez opposes Plaintiff's motion. (Dkt. No. 40, at 25–29.)

In New York, "a claim for intentional infliction of emotional distress requires a showing of (1) extreme and outrageous conduct; (2) intent to cause, or reckless disregard of a substantial probability of causing, severe emotional distress; (3) a causal connection between the conduct and the injury; and (4) severe emotional distress." *Stuto v. Fleishman*, 164 F.3d 820, 827 (2d Cir. 1999). "New York sets a high threshold for conduct that is 'extreme and outrageous' enough to constitute intentional infliction of emotional distress." *Bender v. City of New York*, 78 F.3d 787, 790 (2d Cir. 1996). Conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society," *Stuto*, 164 F.3d at 827, and "[w]hether the alleged conduct is sufficiently outrageous enough to satisfy [this element] is a matter of law for a court to decide," *Baez v. JetBlue Airways*, 745 F. Supp. 2d 214, 223 (E.D.N.Y. 2010).

"Under New York law, although "[t]he standard of outrageous conduct is strict, rigorous and difficult to satisfy . . . , that is not the case when there is a deliberate and malicious campaign

of harassment or intimidation.'" *Rich v. Fox News Network, LLC*, 939 F.3d 112, 123 (2d Cir. 2019) (quoting *Scollar v. City of New York*, 160 A.D.3d 140, 146 (2018)).

In his Counterclaims, Moralez alleges that Plaintiff engaged in a public campaign of asserting false rape allegations against him, causing him severe emotional distress, including the deterioration of his mental health, damaging his reputation, causing "ostracism from his peers." (Dkt. No. 12, ¶¶ 88–100). Specifically, Moralez alleges that Plaintiff: (1) filed a false report of rape with the University on April 15, 2022, (*id.* ¶ 23); (2) contacted at least two other professors, one of whom was employed at another university, and "falsely claimed that Moralez raped" her, (*id.* ¶ 29); (3) filed a false report of rape with the police department, (*id.* ¶ 61); (4) sent Facebook Messages to the daughters of Moralez's friend in New Mexico warning them about Moralez and stating that there he was under criminal and Title IX investigation for "rape" and that Plaintiff was "his most recent victim," (*id.* ¶ 57); and (5) filed the present action. Accepting Moralez's allegations as true, Moralez's allegations that Plaintiff engaged in a campaign of making false rape allegations against him to his employer, police, the daughters of a friend, and other professors allow a plausible inference of extreme and outrageous conduct. *See, e.g.*, *Roelcke v. Zip Aviation, LLC*, 571 F. Supp. 3d 214, 235–36 (S.D.N.Y. 2021) (denying motion for summary judgment where "a reasonable jury could conclude that the plaintiff engaged in a campaign of harassment in which the plaintiff (1) publicly disseminated fabricated physical and sexual assault allegations against Shoshani; (2) maliciously subjected the defendants to judicial and administrative proceedings based on false pretenses; and (3) made harassing communications to Shoshani's ex-wife and ex-sister-in-law" and that this conduct was extreme and outrageous). As Plaintiff does not challenge the remaining elements, having concluded that the counterclaims

sufficiently allege extreme and outrageous conduct, Plaintiff's motion to dismiss Moralez's intentional infliction of emotional distress claim is denied.

### C.      Tortious Interference with Contract

Plaintiff moves for dismissal of Moralez's tortious interference with contract claim on the grounds that Moralez "does not identify any conduct . . . that he says was without 'justification' and made 'maliciously to induce SLU not to perform its contract with Moralez" and that "Moralez fails to allege when or how SLU 'ceased performance' of its contract with Moralez." (Dkt. No. 32-1, at 27–28). Moralez opposes Plaintiff's motion. (Dkt. No. 40, at 29–30).

The elements of tortious interference with contract under New York law are: "(1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional procurement of the third-party's breach of the contract without justification; (4) actual breach of the contract; and (5) damages resulting therefrom." *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401–02 (2d Cir. 2006) (citation and internal quotation marks omitted).

Here, Moralez alleges he "entered into a valid contract with SLU as part of his employment"; that Plaintiff was "aware of the contract between Moralez and SLU, as she herself was provided with SLU's Employment Handbook"; that Plaintiff "intentionally, maliciously, and without justification induced SLU not to perform the contract" by falsely reporting that Moralez raped her, depriving Moralez of a "fair and speedy grievances process"; that Moralez "was placed on administrative leave and suspended from teaching"; and that Plaintiff "induced SLU to cease performance of its contract with Moralez." (Dkt. No. 12, ¶¶ 108–13).[10] "It is imperative

---

[10] Although Plaintiff argues Moralez fails to allege an employment contract, because "New York law recognizes that [even] the at will relationship entails certain limited rights," *Finley v. Giacobbe*, 79 F.3d 1285, 1295 (2d Cir. 1996) (citing *Gorrill v. Icelandair/Flugleidir*, 761 F.2d 847, 851–52 (2d Cir. 1985)), "including the right to maintain an

that, in bringing a tortious interference claim, a plaintiff identify 'the relevant terms of the contract[ ] that existed' that were breached by defendant." *Alvarado v. Mt. Pleasant Cottage Sch. Dist.*, 404 F. Supp. 3d 763, 791 (S.D.N.Y. 2019) (citing *Leadsinger, Inc. v. Cole*, No. 05-cv-5606, 2006 WL 2320544, at *12, 2006 U.S. Dist. LEXIS 55638, at *36–37  (S.D.N.Y. Aug. 10, 2006)). Here, as Plaintiff notes, Moralez does not provide any "details of the contract" or allege any facts indicating what aspect of the contract the University "cease[d]" performing.[11] (Dkt. No. 32-1, at 28). Moralez refers to having been deprived of a "fair and speedy grievances process," and having been placed on administrative leave and suspened, but does not tie those allegations to any terms in "SLU's Employment Handbook." Without factual allegations identifying the relevant terms of the contract that were breached, there is no basis on which to infer a plausible tortious interference with contract claim. *See Alvarado*, 404 F. Supp. 3d at 791 (dismissing tortious interference with contract claim, where the plaintiff alleged she was a school district employee but "failed to plead, among other things, the existence of a valid contract and its terms, or the terms of the contract that Defendants caused a third party to breach").

Moralez argues that the court in *Cojocaru*, 2020 WL 5768723, at *6–7, 2020 U.S. Dist. LEXIS 118907, at *18–19, found that the defendant "properly stated a counterclaim for tortious interference in very similar circumstances where the Plaintiff's allegedly fabricated sexual assault allegations resulted in the Defendant professor's suspension," (Dkt. No. 40, at 30). There,

---

action for tortious interference in certain limited situations," *id.* (citing *Mansour v. Abrams*, 120 A.D.2d 933, 934 (4th Dep't 1986)), Plaintiff's argument is unavailing at this stage of the proceedings.

[11] To the extent Plaintiff also argues that Moralez's tortious interference counterclaim should be dismissed as duplicative of his defamation claims, (Dkt. No. 32-1, at 27), the Court disagrees. Moralez's defamation claims are based on Plaintiff's Facebook Messages and the alleged Phone Chain. Moralez's tortious interference counterclaim is based on Plaintiff's April 15, 2022, statement to the University that he raped her. *See Cojocaru*, 2020 WL 5768723, at *7, 2020 U.S. Dist. LEXIS 118907, at *19–20 (rejecting the argument that tortious interference claim was duplicative of defamation counterclaims, explaining that while defamation counterclaims were "based primarily on Plaintiffs' alleged New York Post interviews and social media posts, the tortious interference claim is based primarily on Plaintiffs' alleged statements to CUNY and its investigators").

however, the defendant alleged that he had a contractual relationship with CUNY, "*the terms of which* included his appointment as a professor, tenure status, teaching privileges, and research funding." *Cojocaru*, 2020 WL 576872, at *6,2020 U.S. Dist. LEXIS 118907, at *19 (emphasis added). By contrast, Moralez alleges only that the contract was "SLU's Employment Handbook" and that he was "conferred contractual rights against SLU." (Dkt. No. 12, ¶ 109–10). Although Moralez contends that he did not receive a "fair and speedy grievance process" and "was placed on administrative leave and suspended from teaching" he does not identify the "relevant terms" of the Handbook that Plaintiff allegedly caused the University to breach. *Alvarado*, 404 F. Supp. 3d at 791. Accordingly, Plaintiff's motion to dismiss Moralez's tortious interference with contract counterclaim is granted.

### D.      Civil Conspiracy

Plaintiff moves for dismissal of Moralez's civil conspiracy claim on the grounds that New York does not recognize civil conspiracy to commit a tort as an independent cause of action, and Moralez has not adequately pleaded an underlying tort; and Moralez has otherwise not alleged facts establishing a conspiracy. (Dkt. No. 32-1, at 29–31.) Moralez opposes Plaintiff's motion. (Dkt. No. 40, at 30–31.)

"New York does not recognize an independent tort of conspiracy," *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401 (2d Cir. 2006) (citing *Alexander & Alexander of N.Y., Inc. v. Fritzen*, 68 N.Y.2d 968, 969 (1986) ("[A]s we long ago held, 'a mere conspiracy to commit a [tort] is never of itself a cause of action.'" (second alteration in original)), "but does allow a claim for civil conspiracy to 'connect the actions of separate defendants with an otherwise actionable tort,'" *ACR Sys., Inc. v. Woori Bank*, 232 F. Supp. 3d 471, 478 (S.D.N.Y. 2017) (quoting *Alexander & Alexander*, 68 N.Y.2d at 969). "Thus, 'a claim for civil conspiracy may stand only if it is connected to a separate underlying tort.'" *Id.* at 478–79 (quoting *Treppel v.*

*Biovail Corp.*, No. 03-cv-3002, 2005 WL 2086339, at *5, 2005 U.S. Dist. LEXIS 18511, at *36

(S.D.N.Y. Aug. 30, 2005)). "Once that threshold showing has been made, the plaintiff must

establish four additional elements: '(1) an agreement between two or more parties; (2) an overt

act in furtherance of the agreement; (3) the parties' intentional participation in the furtherance of

a plan or purpose; and (4) resulting damage or injury.'" *Id.* at 479 (quoting *Treppel*, 2005 WL

2086339, at *5, 2005 U.S. Dist. LEXIS 18511, at *36).

Here, while Moralez sufficiently alleges underlying torts, Moralez's counterclaims fail to

allege civil conspiracy because his allegations of an agreement are wholly conclusory. Moralez

alleges  that Plaintiff told Gillis and Cortes that Moralez raped Plaintiff and that they "conspired

together" and with others, including Moralez's "online harasser," to spread word of Moralez's

alleged rape. (Dkt. No. 12, ¶¶ 29–30, 55); *see Kitchen Winners NY Inc. v. Rock Fintek LLC*, 668

F. Supp. 3d 263, 299–300 (S.D.N.Y. 2023) ("The FATC—although containing facts suggesting

Stern had a business relationship with the Adorama parties and understood aspects of their

business, does not contain any non-conclusory allegations that the Adorama parties and JNS

parties had the requisite 'agreement' or acted 'in the furtherance of a plan or purpose' to commit

any wrong.") (internal citations omitted); *Gorbaty v. Wells Fargo Bank, N.A.*, No. 10-cv-3291,

2012 WL 1372260, at *24, 2012 U.S. Dist. LEXIS 55284, at *78–79 (E.D.N.Y. Apr. 18, 2012)

("[The] Complaint's statement that 'Defendant knowingly entered into an agreement to

fraudulently induce Mrs. Gorbaty to enter into the subject mortgage' is far too conclusory to

sufficiently allege 'an agreement between two or more parties'—an essential element of a civil

conspiracy claim.") (internal citations omitted). Accordingly, Plaintiff's motion to dismiss

Moralez's civil conspiracy counterclaim is granted.[12]

---

[12] Moralez has not sought leave to amend his Counterclaims.

## VI.    CONCLUSION

For these reasons, it is hereby

**ORDERED** that the University's motion to dismiss, (Dkt. No. 22), is **GRANTED** as to Plaintiff's Title VII and Title IX retaliation claims; and it is further

**ORDERED** that Plaintiff's Title VII and Title IX retaliation claims are **DISMISSED**; and it is further

**ORDERED** that the University's motion to dismiss, (Dkt. No. 22), is otherwise **DENIED**; and it is further

**ORDERED** that any amended complaint be filed by April 4, 2024; and it is further

**ORDERED** that Plaintiff's motion to dismiss, (Dkt. No. 32), Moralez's Counterclaims is **GRANTED** as to the Phone Chain defamation claim, tortious interference with contract, and civil conspiracy counterclaims; and it is further

**ORDERED** that Moralez's Phone Chain defamation claim, tortious interference with contract, and civil conspiracy claim are **DISMISSED**; and it is further

**ORDERED** that Plaintiff's motion to dismiss, (Dkt. No. 32), Moralez's Counterclaims is otherwise **DENIED**.

**IT IS SO ORDERED.**

Dated: <u>March 14, 2024</u>
Syracuse, New York

Brenda K. Sannes
Chief U.S. District Judge